CHRISTIE C. JONES, APPELLANT, V. RICHARD H. FOUTCH, APPELLEE.

278 N. W. 2d 572

Filed May 1, 1979. No. 42145.

Robert C. Guinan of Guinan & Kolenda and Thomas J. Culhane of Erickson, Sederstrom, Leigh, Johnson, Koukol & Fortune, P.C., for appellant.

J. Thomas Rowen of Miller & Rowen, P.C., for appellee.

Heard before KRIVOSHA, C. J., WHITE, and HASTINGS, JJ., and COLWELL and VAN PELT, District Judges.

HASTINGS, J.

This was an action for injuries brought by plaintiff, a passenger on the 1971 Honda motorcycle being operated by the defendant on the 17th day of July 1974 when it was involved in a one-vehicle accident near 55th and Center Streets in Omaha, Nebraska. Defendant's motion for a directed verdict, made at the close of plaintiff's case for the reason that plaintiff being a guest passenger under section 39-6,191, R. R. S. 1943, had failed to establish that defendant

was guilty of gross negligence proximately causing the accident, was overruled. Defendant's motion was renewed at the close of all of the evidence and was taken under advisement by the trial court. The case was submitted to the jury which returned a 10 to 2 verdict in favor of the defendant, which was accepted by the court, and judgment on the verdict was rendered accordingly. Immediately thereafter, the trial court ruled in favor of the defendant and sustained defendant's motion for a directed verdict, made at the close of all of the evidence and held under advisement, and the cause was ordered dismissed. Plaintiff's motion for a new trial was overruled. Plaintiff appeals, assigning as error the giving of certain instructions, misconduct of the trial judge in making unprovoked and unrequested comments to the jury regarding the law of the case during plaintiff's closing argument, and the directing of a verdict in favor of the defendant.

At the time of the accident, plaintiff was 15 years of age and a junior in high school, and defendant was 16 years of age. Defendant had a license to operate a motor vehicle, but not a license to operate a motorcycle. He had driven this particular motorcycle two or three times before the accident. The parties had known each other for somewhere between 6 months and 1 year before the accident, but would not consider themselves boy friend and girl friend. Plaintiff had never ridden with defendant on a motorcycle before, but had done so in an automobile and considered him to be a good driver.

On the day of the accident, defendant stopped at plaintiff's house at about 5 o'clock in the afternoon, and plaintiff asked defendant to take her out to Cryer pool in Omaha for a swimming meet with the Hanscom pool swimming team with which plaintiff had some connection. All during the time they were driving out to the pool, plaintiff had no complaints about defendant's driving. They arrived at the pool,

apparently located in the vicinity of 114th and Center Streets, around 6 o'clock. They left the pool sometime later and proceeded east on Center Street to the point of the accident, which occurred around 8 o'clock in the evening.

According to plaintiff, Center Street is a four-lane street except for about 2 blocks near 72nd Street. They proceeded in the curb lane without incident until they reached approximately 65th Avenue, traveling at a speed which kept them up with the flow of traffic. They had passed through the intersection with 65th Avenue when they were run off the street onto the dirt by an automobile pulling in front of them from a side street. Defendant slowed down; they proceeded on the shoulder of the street for about 150 feet and then pulled back onto Center Street, going pretty much with the flow of traffic. "He had to gain a little speed to get back onto the road. Then it was fine after we did." They went through the intersection of 64th Avenue with a green light. An automobile, in which a friend by the name of Kelly Cotton was riding, passed them just after they were forced off the road. They passed the intersection with 63rd Street and the traffic was "pretty heavy" going both east and west on Center Street. About this time, defendant accelerated "a little trying to get past some of the cars, because it was pretty well congested." Defendant was going faster than the flow of traffic, accelerating, and the traffic was "rather heavy." They had been traveling in the outside lane until about halfway between 63rd and 60th Streets when defendant began switching lanes, trying to pass some of the traffic. As they approached 60th Street, they were driving between the lanes, between cars, going faster all of the time, "especially through the intersection here, because if I remember right the light was just turning when Rick and I were coming through. So we beat all the cars through, because he didn't have to slow down,

and they were at a stop.'' Plaintiff said they were accelerating as they reached the intersection with 60th Street, but she didn't know how fast they were going. She looked over defendant's shoulder and saw something that read 90, but didn't know what it was. At that time she told defendant to slow down. That was because she at first thought he wanted to get through the cars and would then slow down, but he just kept going faster and faster.

Just as they got past the railroad tracks, about 1 block east of 60th Street, they saw the automobile in which Kelly Cotton was riding, which was in the inside lane. Defendant passed this car in the outside lane, still accelerating. They traveled about 1½ to 2 blocks after this, defendant continuing to accelerate. Plaintiff said she told him to slow down and still thought he would because she knew a curve was coming. Defendant pulled back over into the inside lane but, although they had been on this same street earlier in the evening, defendant didn't slow down for the curve. There was no other eastbound traffic ahead of them and, as they took the curve, they didn't make it and crashed into the guard rail. As a result of the accident, plaintiff suffered severe, painful, and permanently disabling injuries.

On cross-examination, plaintiff stated she had ridden in an automobile with defendant before this time, but never on a motorcycle, although she had ridden as a passenger on motorcycles perhaps 10 times before this accident. She stated that in her opinion the sole cause of the accident was the speed at which defendant was operating the motorcycle.

Kelly Cotton testified that they were proceeding in the inside lane and the defendant's motorcycle passed them in the outside lane ''right around the railroad tracks.'' The vehicle in which the witness was riding was going about 35 to 40 miles per hour. He thought the motorcycle was going 45 to 50 miles an hour, and that the accident occurred about 2 or 3

blocks farther down the street. Defendant never changed lanes, did not weave between lanes, and went straight on until they hit the curb on the curve.

Gary Gernandt, a police officer, interviewed the defendant shortly after the accident and was told by him that just east of the railroad tracks he must have hit some gravel or something, but that he wasn't going too fast and the next thing he knew, he hit the guard rail. The officer stated his investigation revealed no gravel, sand, or other type of obstruction, but he had observed one skid mark leading from the guard rail and curb area which was hit, running in a southwesterly direction in the outside lane for 61 feet. He testified that the speed limit in this area was 35 miles per hour.

A witness by the name of Cornelius Coleman, who was not acquainted with either party, had been proceeding west on Center Street at the time of the accident. He observed defendant pass a couple of cars about 600 to 1,000 feet before the accident. He said it seemed like the defendant "cut back" and lost control. He estimated the speed of the motorcycle at between 50 and 55 miles per hour.

Defendant testified he was driving between 35 to 40 miles per hour. He started around the curve and was leaning into the curve; he didn't know whether plaintiff was leaning with him, but they didn't make the curve. He said plaintiff had been riding real "good" as a passenger before the accident.

Steven Jensen, an expert in the operation of motorcycles, testified that on a curve, if the passenger does not lean into the curve with the driver, it tends to make the vehicle want to run in a straight line, making it hard to turn. He also testified he would not recommend traveling at a speed of 55 miles per hour within the city limits on a four-lane street making a curve.

The threshold question in this case is whether or not there was sufficient evidence of gross negli-

gence, on the part of defendant proximately causing the accident, to justify submitting the case to a jury. A motion for a directed verdict was made by the defendant at the close of plaintiff's case and again at the close of all the evidence, so the issue was squarely presented to the trial court. For the purpose of evaluating a motion for a directed verdict or a dismissal of a cause of action, all doubt must be resolved in favor of the party against whom the verdict or dismissal is urged. The truth of all evidence he has submitted must be assumed and he must be given the benefit of all inferences therefrom. The question must be whether, in view of these assumptions, the jury could properly bring in a verdict in his favor.

As stated in Davis v. Landis Outboard Marine Co., 179 Neb. 391, 138 N. W. 2d 474 (1965): " 'A guest to recover damages from his host for injury received by the guest while riding in a motor vehicle operated by the host must prove by the greater weight of the evidence in the case the gross negligence of the host relied upon by the guest and that it was the proximate cause of the accident and injury. Gross negligence means great and excessive negligence; that is, negligence in a very high degree. It indicates the absence of slight care in the performance of a duty.' "

Looking at the evidence in the light most favorable to the plaintiff, the jury could have found that defendant was 16 years of age, without a great deal of experience operating a motorcycle; that although he possessed a motor vehicle driver's license, he did not possess a motorcycle operator's license and had only driven this particular motorcycle 2 or 3 times before this accident; that although defendant had been driving in a very satisfactory manner until about 6 or 7 blocks before the point of the accident, as they reached 63rd Street defendant began accelerating, going faster than the flow of traffic

which had become quite congested, and switching lanes to pass automobiles; that as they approached 60th Street defendant did not attempt to switch lanes but was driving between lanes of automobiles, going faster all of the time, and he went through the intersection during the change of the traffic light. The jury could further find that plaintiff told defendant to slow down but he just kept going faster and faster; that as they passed a car of a friend at the railroad tracks near 61st Street and continued to accelerate, plaintiff again told defendant to slow down because they both knew the curve was coming. The jury could have found the speed of defendant's motorcycle to have been 50 to 55 miles per hour in a 35 mile-an-hour zone, which an expert felt was not recommended under the circumstances; that a skid mark extended 61 feet straight to the curb where the collision with the guard rail occurred; and that the defendant didn't know what happened except they just didn't make the curve.

Under those set of facts, it is obvious that defendant, a relatively inexperienced motorcycle driver without an operator's license and the demonstration of proficiency required by such license was operating his vehicle as much as 15 to 20 miles in excess of the speed limit in an area where the traffic was heavy and congested; that he not only was going from lane to lane, but was driving between the lanes; and that he was aware of the impending curve and had been twice warned by plaintiff to slow down, but continued in his negligent operation.

This court said in Luther v. Pawling, 195 Neb. 679, 240 N. W. 2d 42 (1976): "In our past decisions we have commented upon the difficulty of color-matching cases in this area. However, beyond what we have said above about the principles governing the determination of gross negligence, we have held to be significant the presence or imminence of danger that is visible to, known by, or made known to a

driver, together with the *persistence* in negligence apparently heedless of the consequences. These factors should be given material, if not controlling, significance." Also, in Werner v. Grabenstein, 165 Neb. 231, 85 N. W. 2d 297 (1957): "The evidence referred to above discloses that the driver of the truck had knowledge of the imminence of danger. He was thrice cautioned by the other occupants but he persisted in his negligent driving. He had an abundant opportunity to desist from his recklessness. The facts indicate quite clearly that he was heedless of the consequences that might and did quickly ensue from his acts and omissions that should be characterized as grossly negligent. These involve not only rate of speed but other matters such as repeated warnings and requests that he reduce the speed of the truck because he was going too fast, adverse conditions of the road, and the nature of the vehicle he was operating. These were all known to the driver and they enhanced the perils to which he subjected his guest." Finally, in Demont v. Mattson, 188 Neb. 277, 196 N. W. 2d 190 (1972), the rule has been stated as follows: "This court has frequently reiterated in slightly varying language that whether gross negligence exists must be ascertained from the facts and circumstances of each particular case and not from any fixed definition or rule. Boismier v. Maragues, *supra*. In case of doubt or where reasonable minds might differ the evidence must be resolved in favor of the existence of gross negligence, in which case it is a question for the jury."

The evidence permitted a finding of danger known to the defendant, persistence of negligent driving on his part, failure to heed the warnings of plaintiff, and disregard of the consequences that might be suffered by the plaintiff. The evidence supports a finding of gross negligence, and the trial court was correct in submitting the case to the jury and incorrect in later sustaining defendant's motion

for a directed verdict after receiving the jury's verdict.

It is a somewhat unusual situation to have a trial court sustain a motion for a directed verdict for the defendant after having received a jury verdict in favor of the defendant and entering judgment on the same. However, that is precisely what happened in this case. If there is no prejudicial error in the trial and submission of the case, the verdict stands and the granting of the motion is superfluous. On the other hand, if plaintiff is correct and there were prejudicial errors, then the case must be reversed and remanded for a new trial.

Plaintiff complains that the court's instructions are erroneous in that they told the jury that excessive speed itself could not constitute gross negligence and this was confusing to the jury in that it implied to the jury that it could segregate speed from the other allegations and consider it separately in weighing the presence or absence of gross negligence.

By instruction No. 19 the court told the jury as follows: "You are instructed that under the Nebraska Motor Vehicle Guest Statute, gross negligence means great or excessive negligence in a very high degree. It indicates the absence of even slight care in the performance of a duty. It also means an entire failure to exercise care or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the safety of others. There is no fixed rule for the ascertainment of what is gross negligence under the Nebraska Guest Statute, but whether or not gross negligence exists must be determined from the facts and circumstances in each case." Although that instruction may very well have been approved, standing alone, it was not the approved instruction, NJI No. 7.51, requested by the plaintiff. In that regard, this court adopted rule (a) at page IX of NJI as follows: "Whenever Ne-

braska Jury Instructions (NJI) contains an instruction applicable in a Civil or Criminal Case, and the Court, giving due consideration to the facts and the prevailing law, determines that the jury should be instructed on the subject, the *Nebraska Jury Instruction* shall be used.'' (Emphasis supplied.) By not following that admonition, the trial judge fell into the all-too-easy trap of cutting and pasting exceptions and qualifications. For example, by instruction No. 18, he defined a guest and set forth the requirement of Nebraska law that before a guest may recover, the guest must prove gross negligence on the part of the host. However, before having attempted the general definition of gross negligence which appeared in the later instruction No. 19, he offered one definition of what it wasn't: ''Gross negligence does not necessarily extend to wanton or wilful or intentional disregard for the guest's safety.'' He then added another statement which should have been incorporated within the general definition of gross negligence: ''It may arise from a series of acts or omissions, or both, none of which standing alone would constitute more than ordinary negligence, but which taken together may establish gross negligence. In such cases it is for the jury to determine whether a defendant is guilty of gross or ordinary negligence.'' Then followed instruction No. 19, previously quoted. However, there is a further attempt to define gross negligence, or rather what is not gross negligence, in the following language taken from instruction No. 20: ''The line of demarcation between gross and ordinary negligence is not always clear. However, you are instructed that momentary inattention in the operation of a motor vehicle does not ordinarily in itself amount to gross negligence. This is true even where such inattention is voluntary and in no manner induced by a distracting influence. You are further instructed that the operation of a motor vehicle at a rate of speed

prohibited by law is not in itself gross negligence." The plaintiff specifically objected to this instruction at the instruction conference and requested instead the giving of NJI No. 7.51.

What has happened, it seems, is that the trial court took abstract and isolated statements of law made by this court in prior cases, intended for direction of the *trial court*, explaining why the court should or should not have directed a verdict. For example, in the instruction, conference the trial court stated: "That is an exact statement from the case of Calvert, as I remember." This is true, but in Calvert v. Miller, 163 Neb. 501, 80 N. W. 2d 123 (1957), the trial court submitted the case to the jury which resulted in a verdict for the plaintiff. In that case, the defendant driver was attempting to pass another automobile on the highway when the latter, without warning, signal, or justification, turned partially into the passing lane. In reversing the case and ordering it dismissed, this court said: "There is no proof that he [defendant] did not have complete control of the automobile he was operating until the Olsen car was suddenly turned to the left and, to some extent, into the passing lane in which the Chrysler car had moved or was entering for the purpose of passing the Olsen car. There is no evidence that Olsen gave any signal or warning that he was intending to change the position of his car and direct it toward or into the lane to his left or that Gary Miller had or could have had any notice or reason to believe that Olsen would do so. The record permits an inference that Gary Miller was justified in assuming that the Olsen car would continue in the right traffic lane of the highway and that it could be safely passed as the operator of the Chrysler car intended and was attempting to do. Belik v. Warsocki, 126 Neb. 560, 253 N. W. 689. It is a permissible inference from the facts that the cause of the accident was the failure of Olsen to give proper attention

to the traffic to his rear and his improper conduct under the circumstances. There is no reason to conclude that the Chrysler car would not have safely passed the Olsen car without incident but for the unfortunate failure and conduct of Olsen as recited above.

"There is emphasis on the high rate of speed of the Chrysler car. Excessive or improper speed may be evidence of negligence but excessive speed is not alone gross negligence. * * * The situation portrayed by the record may not reasonably be held to disclose that Gary Miller was guilty of gross negligence within the meaning of the guest statute."

In O'Neill v. Henke, 167 Neb. 631, 94 N. W. 2d 322 (1959), the trial court directed a verdict against the plaintiff and dismissed the case. In reversing and ordering a new trial, this court did state: "The rule is: 'Excessive speed of a vehicle *does not necessarily establish gross negligence, although it is a factor to be considered.*' " (Emphasis supplied.) The court went on to discuss the additional claims of negligence, involving control, lookout, unreasonable speed under the circumstances (in addition to speed over the lawful limit referred to in the quotation above), and concluded that " 'a jury question was in our opinion presented as to whether or not, under the circumstances here, the things which defendant did and failed to do amounted to negligence in a very high degree, i.e., gross negligence.' "

In Carley v. Meinke, 181 Neb. 648, 150 N. W. 2d 256 (1967), the trial court directed a verdict for the defendant and on appeal this court reversed and remanded for a new trial. After stating that the evidence, if believed, would support a finding of excessive speed under the circumstances, lack of control, warnings to the driver, etc., this court went on to say: "It is also true that any one of the foregoing acts of negligence might not, standing alone, constitute gross negligence. * * * 'It is apparent that no

one act of the defendant can be separated from the whole of these acts and held to be the independent cause of this accident. Under these circumstances, each act is not to be segregated and weighed separately to determine whether or not it constituted gross negligence. The several acts are to be considered as a whole. While each of several acts, standing alone, may not exceed the bounds of ordinary negligence, yet, taken together, they may establish gross negligence.' ''

The point of all this is to attempt to demonstrate that although the statements taken from prior cases and included in the instructions were correct abstract statements of the law as far as they went, they were not intended to instruct a jury, but rather the judge, as to why the case should or should not have been submitted to a jury. Had the instructions included all the explanatory information set forth in the quotations, the jury might well have been better able to understand what yardstick to use. The court is not unmindful of the frequently-stated rule that any one instruction should be considered in the light of all the others and will not support a claim of prejudice if the meaning of the instruction is reasonably clear and does not tend to confuse the jury. However, it seems to us, in this case, there was no valid reason for pointing out that speed alone is not in itself gross negligence any more than it would have been valid to individually discuss the other items of negligence submitted by the court, i.e., lack of lookout or control, and absence of a valid motorcycle license as provided by law.

"Excessive speed of a vehicle does not necessarily establish gross negligence, although it is a factor to be considered. 60 C. J. S., Motor Vehicles, § 404, p. 1030. '* * * it is not necessary in all cases that the operator of a car be aware of impending danger in order to hold him guilty of gross negligence, but that is a circumstance which should be considered.' ''

Cunning v. Knott, 157 Neb. 170, 59 N. W. 2d 180 (1953). Speed cannot be considered in a vacuum; it is a relative factor which must be considered in light of other surrounding circumstances. Had the trial court, even after having attempted to isolate speed, gone immediately ahead in the same instruction No. 20 with the correct words from NJI No. 7.51: "In this respect, no one act is to be segregated and weighed separately to determine whether or not it constituted gross negligence. Instead the several acts are to be considered as a whole.", rather than require the jury to refer back to instruction No. 18 which contained the somewhat less mandatory words: "It may arise from a series of acts or omissions, or both, none of which standing alone would constitute more than ordinary negligence, but which taken together may establish gross negligence.", it might very well have been acceptable. Nevertheless, in this case we feel that the instruction complained of unduly emphasized and isolated one element of negligence which, standing alone, did not constitute gross negligence, without a clear admonition that it should be considered together with all other factors. As a result, it had a tendency to confuse and mislead the jury. Although certainly not determinative of this court's finding, the fact that the jury wrote the following note to the trial judge after submission of the case affords some evidence of corroboration of the same: "We are having trouble clarifying Gross Negligence. It seems that the two parts to the definition contradict each [other]. Is Gross Negligence (1)  A series of negligent acts (ex 3/out of 4) [sic] or (2)  Willful distruction [sic] (3) or both." The trial court responded with supplemental instruction No. 1 as follows: "In answer to your question, the definition of gross negligence is adequately stated in Instructions 18, 19 and 20. The Instructions do not contradict each other, and are the law in the State of Nebraska. You will kindly re-

read Instructions 18, 19, and 20, because they are not inconsistent." Had the trial court utilized NJI No. 7.51 rather than attempting a piecemeal definition by reciting what gross negligence was not, such confusion probably would not have resulted.

Whenever applicable and practicable, Nebraska Jury Instructions (NJI) are to be used when charging the jury, but if it becomes necessary to draft a special definitional instruction it should, whenever possible, be placed in an affirmative rather than a negative posture.

The other error claimed by plaintiff's attorney occurred during the last 6 minutes of plaintiff's rebuttal argument. Unfortunately, according to plaintiff's affidavit, no court reporter was immediately available to make a record of what had transpired, although at the request of plaintiff's attorney the proceedings were halted to make an attempt to locate one. It was agreed the argument would proceed and the jury was instructed and retired to deliberate at 12:10 p.m. A record was then made at 12:15 p.m., in which, as might be expected, there was some disagreement as to what the facts truly were. In this regard, it might be well to point out that even though neither the statutes nor the rules of the court specifically require the presence in court of the reporter throughout every phase of the trial, it is certainly advisable that one be available.

When the record was made, plaintiff's counsel stated that in rebuttal to the argument of defendant's counsel, he, plaintiff's counsel, said: " 'Taking the logical extension of Mr. Rowen's argument, I would ask you if he is trying to tell you that a vehicle in which you would be a guest passenger' — and I suggested that perhaps it might even be the jurors themselves on their way home — 'and that it was traveling 100 miles an hour on Dodge Street,' and I was about to get into the point of giving the traffic situation on Dodge Street and the fact it's a two-lane

street, and just as I was about to discuss these other pertinent factors, Judge Tesar interjected and said, 'That's right, that's right.' '' The trial judge disagreed and said: ''The only difference is that the statement was a little different from what was put into the record. The statement was, 'Do you mean to tell me if a person goes 100 miles an hour on Dodge Street that that is not gross negligence?' and the Court said, 'Yes, I mean to tell you that.' He said, 'You mean to tell me going 100 is not gross negligence,' and used the words gross negligence, without any question, and that's why I stopped you.'' Plaintiff's counsel replied: ''At that point I was just about to extend the original part of the argument concerning Dodge Street and I wasn't allowed to continue that; that's when he said, 'That's right, that's right,' to the jury. The judge replied, ''I said that; that's exactly right as to what I said because you asked the question and I answered it for you.'' Plaintiff's attorney replied: ''Further, the defendant's argument was based, as far as liability is concerned, strictly on the issue as to whether or not the plaintiff had shown speed alone, so this became the focal point of the whole final argument and the interjection by the Judge was directed to that area.'' It appears from that portion of the record that plaintiff's attorney was asking a rhetorical question of the jury, expecting an answer only in their verdict, but the trial judge volunteered his answer.

The affidavit of plaintiff's attorney made some 3 days later and being a part of the transcript, although being somewhat more in detail and containing conclusions of counsel, is not substantially different from the record made. From that portion of the bill of exceptions constituting argument on the motion for a new trial, it is obvious that defendant's attorney interpreted the judge's remarks as instructing plaintiff's attorney that such attorney's statements earlier referred to were improper.

It is practically impossible to draw any firm and accurate conclusions as to what occurred without an actual recording, not only of the words spoken but the manner as well as the tone of voice employed. Any time a lawyer in his argument to the jury attempts to figuratively expand the record with hyperbolic examples, he runs the risk of an admonition by the court, whether requested by opposing counsel or not. On the other hand, the trial judge should confine himself to such admonitions, not attempt to amplify his written instructions, and refrain from remarks that are calculated in any way or may have the tendency to influence the minds of the jury. It is our opinion that although the comments made by the trial judge, whatever they in fact were, may not have been sufficient to constitute reversible error, at least they had to have the effect of exacerbating the prejudical effect of the isolation of speed as set forth in the court's instructions.

From a consideration of all of the facts and circumstances, it is our opinion that error was present, as set forth above, which was prejudical to the plaintiff. Accordingly, the judgment of the trial court is reversed, both as to the verdict of the jury and the dismissal by the court, and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

COLWELL, District Judge, concurs in result.