ERVIN E. IMIG, PERSONAL REPRESENTATIVE OF THE ESTATE OF LOIS B. SCHAAP, DECEASED, APPELLANT, V. WILLIAM MARCH, PERSONAL REPRESENTATIVE OF THE ESTATE OF OTTO F. SCHAAP, DECEASED, APPELLEE.

279 N. W. 2d 382

Filed May 29, 1979. No. 41941.

M. J. Bruckner and Gary J. Nedved of Marti, Dalton, Bruckner, O'Gara & Keating, for appellant.

Patrick H. McDonnell, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

This is a wrongful death action brought by the personal representative of a deceased wife against the personal representative of her deceased husband. Lois B. Schaap was the only other passenger in an airplane piloted by Otto F. Schaap, and the petition

alleged that his acts of negligence and gross negligence were the proximate cause of the crash which occurred on February 26, 1977, resulting in these deaths. Defendant filed a demurrer questioning plaintiff's capacity to sue because of the marriage relationship which existed between the two decedents at the time of the accident. The trial court, although expressing the opinion that its decision might be overturned, felt that it was bound by the law as previously established by this court and sustained the demurrer. Plaintiff appealed. The issue is whether we should adhere to the traditional rule of interspousal immunity as it applies to tort liability.

Essentially, plaintiff argues that the doctrine of interspousal tort immunity is of judicial origin and this court has the power to modify or abolish it in the absence of legislative action to the contrary. Defendant insists that the doctrine was adopted by the Legislature when it adopted the common law of England by virtue of section 49-101, R. R. S. 1943, and its predecessor, the Revised Statutes of the Territory of Nebraska, July 1, 1866.

The doctrine was first judicially pronounced in Emerson v. Western Seed & Irrigation Co., 116 Neb. 180, 216 N. W. 297 (1927). In that case, this court held that the statutes which granted married women certain independent contract and property rights and the right to sue and be sued did not authorize a suit by a wife against her husband to recover damages for injuries to her person. In a somewhat simplistic justification of its position, the court expressed itself with this language: ''The legislation of this state apparently was designed to remove disabilities from married women, so as to place the sexes in equal position before the law. This was fully attained. The husband may not sue the wife for tort. Both spouses have the same disability and the equality is complete.''

Although, as indicated, the court in Emerson re-

lied to a certain extent on the so-called "married woman's act," as did Skinner v. Skinner, 38 Neb. 756, 57 N. W. 534 (1894), it did not cite Skinner. The holding in Skinner was limited to permitting a wife to sue her husband in contract for the use of real estate belonging to her, but its language was of considerably greater breadth. This was manifested by an answer to a non sequitur advanced by the husband's counsel that the act, which permits a married woman to sue in the same manner as if she were unmarried, does not authorize her to sue her husband because if she were unmarried she would have none to sue. The court replied: "The answer to this proposition is, 'that if this woman was unmarried, she could at common law sue this man; being a married women, she could not at common law sue her husband, or any one else; but the statute having removed her common law disability in that respect, she may now sue any person whom she could sue, either at common law or under the statute, if she were unmarried. Her legal ability to sue and be sued is not limited to matters having reference to her separate property, trade, or business, as is her legal ability to make contracts.' "

In an even earlier case, May v. May, 9 Neb. 16, 2 N. W. 221 (1879), this court, in permitting suit by a wife against her husband on a promissory note, cited with approval this rather broad and liberating language from an 1856 California case: " 'The present policy of the law is to recognize the separate legal and civil existence of the wife, and separate rights of property, and the very recognition by the law of such separate existence and rights at law, as well as in equity, to hold and enjoy separate property, involves a necessity for opening the doors of the judicial tribunals to her in order that the rights guaranteed to her may be protected and enforced.' "

Both Emerson and Skinner cited the progenitor of section 25-1201, R. R. S. 1943, now repealed, which

prohibited a husband or wife from testifying "concerning any communication made by one to the other during the marriage." What effect that had in Emerson is not revealed with any certainty, but in any event, that statute has been repealed and replaced by section 27-505, R. R. S. 1943, which limits the prohibition to "any confidential communication."

The real basis for the decision in Emerson may be found in the following language from the opinion: "An examination of the decisions of other jurisdictions discloses a great weight of opinion opposed to opening a field of litigation between spouses in tort actions by means of judicial interpretation and without unmistakable legislative action. The procedural difficulties, the dangers of disrupting the secrecy and serenity of marital relations, the avenue for fraud, the startling innovation in permitting such controversies, and the lack of clear legislative indorsement have all been assigned as ample reasons for the refusal of the courts to sanction, by supplying statutory interpretation, a new form of litigation manifestly requiring unequivocal legislation for its existence." These considerations include all of the traditional reasons advanced by the courts of the United States for prohibiting tort suits between spouses. These suits are now rejected in approximately one-half of the states.

However, Nebraska seems to have been unique in assigning "procedural difficulties" as a reason for adopting the doctrine. It is difficult to envision what these "difficulties" might be which are any different than those arising in either a marriage dissolution case, a criminal charge, or a suit involving contract or property rights.

Perhaps the best answer to the "secrecy and serenity" argument is the response of Professor Prosser, cited with approval in many cases, including Brooks v. Robinson, 259 Ind. 16, 284 N. E. 2d 794

(1972): " 'The chief reason relied upon by all these courts, however, is that personal tort actions between husband and wife would disrupt and destroy the peace and harmony of the home, which is against the policy of the law. This is on the bald theory that after a husband has beaten his wife, there is a state of peace and harmony left to be disturbed; and that if she is sufficiently injured or angry to sue him for it, she will be soothed and deterred from reprisals by denying her the legal remedy — and this even though she has left him or divorced him for that very ground, and although the same courts refuse to find any disruption of domestic tranquillity if she sues him for a tort to her property, or brings a criminal prosecution against him. If this reasoning appeals to the reader, let him by all means adopt it.' Prosser, Law of Torts, 863 (4th Ed. 1971)."

The "avenue for fraud" objection is likewise rationally answered in Brooks v. Robinson, *supra:* "Those who advocate this view have simply concluded that since the *possibility* exists that tort litigation between husband and wife will not constitute a truly adversary proceeding, we should therefore close the courtroom doors to these parties and leave the injured to suffer his loss and the wrongdoer to escape his liability. To adopt such a view requires the blanket assumption that our court system is so ill-fitted to deal with such litigation that the only reasonable alternative to allowing husband-wife tort litigation is to summarily deny all relief to this class of litigants. It should be noted that this 'reasonable alternative' is absolutely contrary to the spirit of our legal system — namely, that an injured party may seek redress for his injuries in our courts." It is the regular business of the courts to find the truth. We ought not deny what should be due the many for fear that the judicial process cannot weed out the spur-

ious claims of a few. Immer v. Risko, 56 N. J. 482, 267 A. 2d 481 (1970).

It is somewhat difficult to know just what the court in Emerson was referring to in its "startling innovation" reason for denying this type of action. Undoubtedly it was tied up in the old common law doctrine of the unity of husband and wife, or as Professor Prosser states in his Law of Torts, s. 122 (4th Ed., 1971): "It has been said, whether humorously or not, that at common law husband and wife were one person, and that person was the husband * * *. It is perhaps idle to speculate at this late date as to how far the historical basis of these rules is a mixture of the Bible and medieval metaphysics, the position of the father of the family in Roman law, the natural law concept of the family as an informal unit of government with the physically stronger person at the head, or the property law of feudalism. A combination of all these incidents made it impossible to maintain a tort action between husband and wife. If the man were the tort-feasor, the woman's right would be a chose in action which the husband would have the right to reduce to possession, and he must be joined as a plaintiff against himself and the proceeds recovered must be paid to him; and if the tort involved property, the wife had no right of possession to support the action. If the wife committed the tort, the huband would be liable to himself for it, and must be joined as a defendant in his own action. As a result, it was held that neither spouse could maintain an action against the other for either a personal or a property tort, whether it was committed before or during marriage; and the action was not maintainable even after divorce, which came late in the English law, after these rules were well established."

It would appear that in light of the so-called "married woman's act" the historical basis for inter-

spousal immunity no longer exists. If this be a "startling innovation," so be it.

Finally, according to Emerson, there is a "lack of clear legislative indorsement." The Michigan court in Mosier v. Carney, 376 Mich. 532, 138 N. W. 2d 343 (1965), discussed the interpretations placed by various courts on the married woman's act vis-a-vis interspousal immunity, and came to this conclusion: "The fact that virtually the same statutory language is subject to varying interpretations by these courts suggests strongly that the actual basis for many of their decisions is a reappraisal of the common law and its rejection because no longer applicable to the facts of modern civilization.

"We shall pursue a more forthright course in our disposition of the cases at bar. Since the doctrine of interspousal tort immunity is a creation of the common law and since such doctrine has never been codified in this State, it is our duty to re-examine it and, if necessary to avoid continuing injustice, to change it."

Actually, we need not go outside our own jurisdiction. The rule exempting governmental subdivisions from tort liability was grounded on the common law, adopted by this court in Gillespie v. City of Lincoln, 35 Neb. 34, 52 N. W. 811 (1892), and abrogated in Brown v. City of Omaha, 183 Neb. 430, 160 N. W. 2d 805 (1968). The words justifying the court's action in the latter case are these: " 'The dozen or so state supreme courts that have recently abrogated the immunity doctrine have recognized that an unjust and irrational principle cannot be allowed to persist on the hollow ground that changing an antiquated rule is a job for the legislature.' "

In Duncan v. Nebraska Sanitarium & Benevolent Ass'n., 92 Neb. 162, 137 N. W. 1120 (1912), this court adopted the rule of charitable institution immunity with these final words: "While there is a diversity of opinion as to the reasons for the rule, the doctrine

itself is *firmly established."* (Emphasis supplied.) In Myers v. Drozda, 180 Neb. 183, 141 N. W. 2d 852 (1966), this "firmly established" doctrine was repealed: "If this exemption formerly met a need, it has had its day. * * * If we endorsed legislation by silence, we erred. * * * Stare decisis 'was intended, not to effect a "petrifying rigidity," but to assure the justice that flows from certainty and stability. * * * we would be abdicating "our own function, in a field peculiarly nonstatutory," were we to insist on legislation and "refuse to reconsider an old and unsatisfactory court-made rule."

" ' * * * judges of an earlier generation declared the immunity simply because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation firmly reach a contrary conclusion they must be ready to discharge their own judicial responsibilities in conformance with modern concepts and needs.' "

Restatement, Torts 2d, § 895 F, p. 423, adopted and promulgated May 19, 1977, but published and released in 1979, provides as follows: "Husband and Wife (1) A husband or wife is not immune from tort liability to the other solely by reason of that relationship." It perhaps is obvious, but in adopting such a rule this court is aware of the existence of some problems which are covered in Comment h. of section 895 F, and Comment k. of section 895 G, i.e., the intimacy of the family relationship may affect the determination of whether conduct is negligent or not, whereas if the conduct giving rise to an injury does not grow out of the family relationship, the existence of negligence may be determined as if the parties were not related. In other words, negligence in some instances may depend upon the conduct of an "ordinary, prudent spouse" rather than an "ordinary, prudent person."

Having concluded that the reasons for adopting

the doctrine in the first instance are no longer judicially sound, and finding no legislative barriers existing, we hereby abrogate the common law doctrine of interspousal tort immunity. This approach completely reflects both the spirit and the letter of section 25-305, R. R. S. 1943, "A woman may while married sue and be sued in the same manner as if she were unmarried" and Article 1, section 13 of the Constitution of the State of Nebraska which provides: "All courts shall be open, and every person, for any injury done him in his lands, goods, person or reputation, shall have a remedy by due course of law, and justice administered without denial or delay."

Section 30-809, R. R. S. 1943, provides in part: "Whenever the death of a person shall be caused by the wrongful act * * * of any person * * * and the act * * * is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages * * * the person who * * * would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured * * *." Having held today that plaintiff's decedent, if death had not ensued, would have been entitled to maintain an action against defendant's decedent, the plaintiff does have capacity to sue in this instance and the petition states a cause of action.

The judgment is reversed and the cause remanded to the trial court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

CLINTON, J., dissenting.

I respectfully dissent from the majority opinion. The court abolishes the doctrine of interspousal immunity for negligent torts by means of examining and demolishing the various specious reasons which the courts have used in the past to support the doctrine, or by demonstrating the present inapplicabil-

ity of reasons formerly relied upon. The short-coming of the opinion, I believe, is that it does not even once ask nor attempt to determine whether there still exist sound reasons which support the doctrine. I believe such reasons exist and are of sufficient importance to continue the immunity as a matter of policy.

If one spouse is to respond in money damages to the other spouse or the estate of a spouse or, as in this case, the estate of one to the estate of the other for the benefit of those who suffered economically by the death of the wife, it must be assumed the judgment may, in whole or in part, be paid by either the tort-feasor or his or her estate. Such payment obviously will affect, perhaps seriously, the financial integrity and security of the family as a whole and bring with it other concomitant disharmonies. If one could be sure an insurer is going to pay the bill in every case, then, of course, these objections are removed. Of that though we cannot be sure.

One can conjure various factual situations in which bad results will occur from abolition of immunity. We will give only a few illustrations. One may concur under the apparent facts of this case. The beneficiaries of Mrs. Schaap's estate are her children by a prior marriage, not the children of the deceased couple. It also appears her children are all of legal age. Does Mr. Schaap have children who are dependent upon him for support? Are they the ones who might suffer because of a judgment which might be rendered? We do not know.

Let us assume another situation. A family has a handicapped child. Their estate plan calls for this child's needs to be first met or, perhaps because the estate is relatively small, to be met exclusive of the needs of other children who are or soon will be capable of supporting themselves. An estate plan such as this may be completely disrupted by a judgment which the estate or one spouse must pay.

One might argue that no suit will be filed if the judgment will be paid from family funds. We cannot be sure of this, especially where, as is common these days, each spouse has children of whom the other is not the parent, adoptive or biological. That may be this very case.

I would abolish interspousal immunity in the case of negligent torts only in those cases where, and to the extent that, the risk is one covered by liability insurance. I would further make the pleading of coverage an element of the cause of action — for to the extent that insurance covers the liability, the policy provisions behind the immunity doctrine do not apply. This is what has been done in some cases where the doctrine of governmental or charitable immunity has been modified.

Intentional torts involve somewhat different considerations. They are not covered by liability insurance and what should be done in those cases presents a different question which can be solved when the question arises. The quotation in the opinion from Professor Prosser is irrelevant to the case before us.