PATRICIA J. WICKER, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JACK CALVIN WICKER, DECEASED, APPELLANT, V. CITY OF ORD, A NEBRASKA POLITICAL SUBDIVISION, ET AL., APPELLEES.

447 N.W.2d 628

Filed November 3, 1989.    No. 88-105.

Peter B. Beekman, of Weaver, Beekman & Merz, for appellant.

John R. Brownell, of Lauritsen, Baker, Brownell & Brostrom, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Plaintiff-appellant, Patricia J. Wicker, individually and as the personal representative of the estate of her deceased husband, Jack Calvin Wicker, sued the defendants-appellees, City of Ord, Nebraska, and Rural Fire Protection District #2 of Valley County, Nebraska, under the provisions of the Political Subdivisions Tort Claims Act for her husband's loss of his chance for survival. Plaintiff appeals from the trial court's sustainment of defendants' joint motion for summary judgment, assigning six errors, which merge to claim that the court below erroneously (1) determined that Neb. Rev. Stat. § 71-5111 (Reissue 1986) shields defendants from liability; (2) found that defendants' personnel did not act in a willful, wanton, or grossly negligent manner; and (3) failed to find, as a matter of law, that defendants' personnel did act in a willful, wanton, or grossly negligent manner. We affirm.

Before reviewing the facts, it is appropriate that we set forth the language of § 71-5111:

No certified ambulance attendant who provides public emergency care or rescue service shall be liable in any civil action to respond in damages as a result of his acts of commission or omission arising out of and in the course of his rendering in good faith any such service. Nothing in this section shall be deemed to grant any such immunity for liability arising out of the operation of any motor vehicle in connection with such service, nor shall immunity apply to any person causing damage or injury by his willful, wanton, or grossly negligent act of commission or omission.

For purposes of the foregoing section, Neb. Rev. Stat. § 71-5102(2) (Reissue 1986) defines "ambulance attendant" as one "trained or qualified to provide for, or any other individual who provides for, the care of patients while such patients are being transported in an ambulance."

The record establishes that the city contracted to provide emergency rescue services to the aforenamed fire protection district through the city's volunteer fire department, known as Ord 99. Plaintiff pled, and defendants admitted, that Ord 99 acted throughout the event we are about to describe as the agent of the city. The deposition testimony and other exhibits received in evidence fail to establish that the rural fire protection district was negligent in entering into the contract with the city or that the district did anything other than receive the services for which it contracted. Thus, the record fails to establish any basis for imposing liability on the fire protection district, see *Dabelstein v. City of Omaha*, 132 Neb. 710, 273 N.W. 43 (1937), and, thus, the judgment of the trial court as to that defendant must be, and is hereby, affirmed.

The remainder of this opinion concerns itself with the issues plaintiff's summarized assignments of error raise with respect to the City of Ord. In that regard, the record shows that the decedent was working as a concrete form carpenter at a construction site in rural Valley County, apparently within the jurisdiction of the fire protection district, when, at approximately 4 p.m., he collapsed from an unknown cause. After falling to the ground, the stricken victim began convulsing, vomited, and apparently voided himself. As his

coworkers gathered around him, one of them, Steve Anderson, began to administer cardiopulmonary resuscitation and was later joined by Joseph Ambrose. While those two continued resuscitation efforts, a foreman at the construction site summoned an ambulance to the scene.

The Ord Police Department dispatcher's log shows that the alarm summoning volunteer rescue workers from Ord 99 was sounded at 4:20 p.m. It was necessary for the ambulance to travel over rough terrain in order to reach the construction site, which was located approximately 10.5 miles from Ord, and, as a result, the Ord 99 rescue workers arrived at the scene approximately 20 to 25 minutes after the alarm was sounded. The record further shows that a total of 14 volunteers responded to the alarm, 8 of whom were volunteer emergency medical technicians who had received only the most basic level of training.

When the rescue workers arrived, they found members of the construction crew gathered around the stricken victim, with one crewmember, Anderson, administering resuscitation. Frank Smedra was apparently the first volunteer to reach the victim. Smedra asked Anderson to discontinue resuscitation efforts so that he (Smedra) could check the stricken victim's vital signs. After Smedra and at least one other volunteer had examined the victim, the volunteers concluded that death had occurred, and did not resume resuscitation efforts. A deputy sheriff was then called to the scene to pronounce the victim dead, after which decedent was transported to a mortuary.

The record includes evidence that the volunteers acted improperly by failing to continue or resume resuscitation efforts upon the stricken victim. According to applicable standards promulgated by the American Heart Association and the American Medical Association, such efforts should have been resumed immediately after Smedra had checked the vital signs, and the decedent should have been transported to a hospital, with resuscitation efforts continued during transportation.

The deposition of Stephen W. Carveth, M.D., a cardiovascular and thoracic surgeon, provides evidence that a stricken person's chance of survival is "up to . . . 50 percent" if

cardiopulmonary resuscitation is administered within 3 minutes. However, the deposition of Dale L. Kemmerer, M.D., provides evidence that decedent's chance of survival may have been considerably less than 50 percent even if such efforts had been continued in this case.

Eight of the responding volunteers, including Smedra and Wayne D. Brown, the two deposed by plaintiff, had received their initial emergency medical technician training, consisting of approximately 82 hours of instruction, 12 to 14 years prior to the subject incident. Both Brown and Smedra have had some limited additional followup training.

When deposed, Smedra was asked if he recalled the procedure for terminating resuscitation efforts after they had been initiated. He replied, "It would be — one-man would be until somebody qualified who would come up and take over or if somebody would take over for you or a physician to take over for you, or if you would just be exhausted to the point that you couldn't." The record does not indicate whether Smedra was aware of or remembered the proper guidelines for terminating resuscitation efforts at the time he went to decedent's aid.

In giving his deposition, Brown indicated that Ord 99 had no procedure for discontinuing resuscitation efforts after they had been initiated. Brown did not recall what had been taught in his emergency medical technician training course with respect to the proper termination of such efforts.

In view of the errors assigned and the resolution we reach, we assume, as the trial court apparently did, but do not decide, that plaintiff has pled a theory on which she might, under appropriate circumstances, recover under our law.

We begin our analysis of the question presented by the first summarized assignment of error, whether the immunity § 71-5111 grants to certified ambulance attendants also applies to their principals, by reviewing *Pullen v. Novak*, 169 Neb. 211, 99 N.W.2d 16 (1959). In that case a young child was injured when struck by an automobile. He named his father and his father's employer as defendants in the case on the theory that the father's negligence was within the scope of his employment and caused the accident. The petition was dismissed as to the father on the ground that an unemancipated minor could not

sue for the negligent tort of a parent. In affirming the summary judgment entered in favor of the father's employer, this court stated:

> It should be remembered that [the employer's] liability, if any, is not that of a joint tort feasor but derivative solely from the liability of [the father], if any. . . .
>
> . . . .
>
> In Emerson v. Western Seed & Irr. Co., [116 Neb. 180, 216 N.W. 297 (1927)], we held a married woman could not sue her husband to recover damages for injuries to her person and consequently she could not sue her husband's employer for damages caused by the husband's negligence, stating as the reason for so holding that: "It would seem that to permit a recovery against the employer results simply in countenancing an encircling movement where a frontal attack upon the husband is inhibited." . . . " 'The primary liability to answer for such an act, therefore, rests, upon the employee, and when the employer is compelled to answer in damages therefor he can recover over against the employee.' " . . .
>
> . . . .
>
> Having come to the conclusion that even if [the father] could be said to be guilty of the specific charges of negligence made against him, a question which we assumed in favor of appellant but factually did not decide, such guilt would not support a verdict in favor of appellant against [the employer] because, as we said, appellant could not maintain an action therefor against [the father].

169 Neb. at 224-26, 99 N.W.2d at 25-26.

While the law concerning interspousal immunity has changed, *Imig v. March*, 203 Neb. 537, 279 N.W.2d 382 (1979), our attention has been called to nothing, nor did our independent research efforts reveal anything, which suggests that the law of agency applied in *Pullen* has changed.

It is also a well-established rule in this state that " '[i]n a tort action based exclusively on the alleged negligence of an employee or agent, a valid release of that employee-agent releases the employer or prinicpal [sic] from liability, even

though the release specifically reserves all claims against the employer-principal.' " *Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 354, 436 N.W.2d 184, 188 (1989), quoting *Dickey v. Meier*, 188 Neb. 420, 197 N.W.2d 385 (1972). *Mallette v. Taylor & Martin, Inc.*, 225 Neb. 385, 406 N.W.2d 107 (1987), and *Ericksen v. Pearson*, 211 Neb. 466, 319 N.W.2d 76 (1982), are in accord.

Moreover, when a public employee has been found to be immune from liability, this court has generally held that such immunity extends to the political subdivision. For example, in *Allen v. County of Lancaster*, 218 Neb. 163, 352 N.W.2d 883 (1984), a county health officer's discretionary immunity also immunized the county from liability. And in *Koepf v. County of York*, 198 Neb. 67, 251 N.W.2d 866 (1977), a sheriff's quasi-judicial immunity for ministerial acts also immunized the county from liability.

Applying the foregoing principles of agency to the question at hand, we conclude that the immunity § 71-5111 grants to the attendants who responded to the call in this case shields Ord 99 as their principal from liability to the same extent as it shields the agent-attendants.

That determination makes it necessary that we address the remaining two summarized assignments of error, which concern the degree of the negligence proved. As they are the converse of each other, they will be treated together.

In undertaking that analysis, it is well to begin by reminding ourselves that summary judgment is properly granted when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences which may be drawn from the material facts and the moving party is entitled to judgment as a matter of law. Moreover, in reviewing an order granting a summary judgment, this court must take the view of the evidence most favorable to the party against whom it operates and give that party the benefit of all favorable inferences which may be drawn from the evidence. *Nichols v. Ach, ante* p. 634, 447 N.W.2d 220 (1989); *Graphic Resources, Inc. v. Thiebauth, ante* p. 592, 447 N.W.2d 28 (1989); *Bank of Burwell v. Kelley, ante* p. 396, 445 N.W.2d

871 (1989); *First Security Sav. v. Aetna Cas. & Surety Co., ante* p. 335, 445 N.W.2d 596 (1989); *State Farm Fire & Cas. Co. v. Victor,* 232 Neb. 942, 442 N.W.2d 880 (1989).

Since the immunity granted by § 71-5111 does not extend to willful, wanton, or gross negligence, the question we must ask is whether it can be said as a matter of law that the city's personnel were not so negligent.

Addressing first the standard applicable to willful or wanton conduct, we look to *Guenther v. Allgire,* 228 Neb. 425, 428-29, 422 N.W.2d 782, 785 (1988), in which this court stated:

> In order for an action to be willful or wanton, the evidence must prove that a defendant had *actual* knowledge that a danger existed and that the defendant *intentionally* failed to act to prevent harm which was reasonably likely to result. The term imparts knowledge and consciousness that injury is likely to result from the act done or the omission to act, and a constructive intention as to the consequences. *Gallagher v. Omaha Public Power Dist.,* 225 Neb. 354, 405 N.W.2d 571 (1987).
>
> To constitute willful negligence the act done or omitted must be intended or must involve such reckless disregard of security and right as to imply bad faith. Wanton negligence has been said to be doing or failing to do an act with reckless indifference to the consequences and with consciousness that the act or omission would probably cause serious injury. *Id.,* quoting from *Garreans v. City of Omaha,* 216 Neb. 487, 345 N.W.2d 309 (1984).

(Emphasis in original.)

In *Gallagher v. Omaha Public Power Dist.,* 225 Neb. 354, 405 N.W.2d 571 (1987), cited in *Guenther, supra,* suit was brought against Omaha Public Power District for injuries a boy sustained while sledding on property owned by the district and made available to the public for recreational purposes. Consequently, the land was subject to the Recreation Liability Act; therefore, the district could be held liable only for willful or malicious failure to guard or warn against a dangerous condition on the land. The accident occurred when the boy's sled struck a metal object which was embedded in the snow. The suit alleged that the district's failure to warn of the dangerous

condition of the lot donated for recreational purposes constituted a willful and malicious act on the part of the district. In resolving the issue, this court stated:

> We have further examined the record in its entirety and find no evidence to support a claim that the District had *actual knowledge* that a danger existed, and, therefore, the District could not be found to have willfully or maliciously failed to guard or warn against such dangerous condition or structure as required by § 37-1005....
>
> ....
>
> In view of the fact that the evidence fails to disclose that the defendant willfully or maliciously failed to guard or warn against the dangerous conditions or structure, the District was relieved of liability as a matter of law.

(Emphasis supplied.) *Gallagher, supra* at 359, 405 N.W.2d at 575.

While plaintiff argues that the volunteer attendants intentionally discontinued efforts to revive the victim through cardiopulmonary resuscitation and that they knew that proper procedures required them to continue resuscitation efforts and transport the victim to a hospital, it nonetheless cannot be said that the volunteers acted in a willful or wanton manner. First, while Smedra apparently knew the proper termination procedures at the time he was deposed, nothing in the record indicates that he remembered them at the time he went to the victim's aid. Even if Smedra or any of the other attendants responding to the call did remember that according to recognized standards resuscitation efforts should have been continued, the danger which was to be avoided here, according to plaintiff's theory, was the possibility that the victim would lose his chance of survival, and not the danger that recognized procedures for termination of resuscitation efforts would not be followed. Because the attendants were convinced that the victim was dead, they had no knowledge of the danger that the discontinuance of resuscitation efforts could result in the loss of the victim's chance of survival. Because the attendants were not aware of that danger, they did not have the requisite actual knowledge required under *Gallagher* to enable them to

extinguish the victim's chance of survival through a willful or wanton act.

The next question, then, is whether the attendants acted in a manner which was grossly negligent. *Jones v. Foutch*, 203 Neb. 246, 252, 278 N.W.2d 572, 576 (1979), provides the standard for determining the existence of such negligence: " ' "Gross negligence means great and excessive negligence; that is, negligence in a very high degree. It indicates the absence of slight care in the performance of a duty." ' "

> "[W]hether gross negligence exists must be ascertained from the facts and circumstances of each particular case and not from any fixed definition or rule. [Citation omitted.] In case of doubt or where reasonable minds might differ the evidence must be resolved in favor of the existence of gross negligence, in which case it is a question for the jury."

*Id.* at 254, 278 N.W.2d at 577.

Smedra, employed as a lineman for the Loup Valley Rural Electrification Association and the first attendant onto the scene, and seven other volunteer certified ambulance attendants responded to the alarm summoning them to the aid of the victim. When they arrived at the scene, they examined the victim in the manner in which they had been trained and concluded that he had died. While the attendants may have been negligent in failing to remember recognized protocol for terminating cardiopulmonary resuscitation, or in failing to follow the proper procedure if they did remember it (perhaps even negligent as a matter of law), no reasonable person could conclude that the volunteer attendants acted without slight care.

We thus conclude that as to the city there exists no genuine issue concerning any fact or as to the inferences to be drawn therefrom and that it is likewise entitled to judgment as a matter of law and was properly granted summary judgment.

AFFIRMED.

WHITE and FAHRNBRUCH, JJ., concur in the result.