510 Pa. 1 (1986)
507 A.2d 1
Concepcion L. RIVERA, Administratrix of the Estate of Frederick L. Rivera, Deceased, Appellant,
v.
The PHILADELPHIA THEOLOGICAL SEMINARY OF ST. CHARLES BORROMEO, INC. a/k/a St. Charles Seminary and Our Lady of Lourdes Catholic Church, Appellees.
Concepcion L. RIVERA, Administratrix of the Estate of Frederick L. Rivera, Deceased, Appellee,
v.
The PHILADELPHIA THEOLOGICAL SEMINARY OF ST. CHARLES BORROMEO, INC. a/k/a St. Charles Seminary and Our Lady of Lourdes Catholic Church.
Appeal of the PHILADELPHIA THEOLOGICAL SEMINARY OF ST. CHARLES BORROMEO, INC. a/k/a St. Charles Seminary.
Supreme Court of Pennsylvania.
Argued April 16, 1985.
Decided March 14, 1986.
*2 *3 *4 Jeffrey M. Stopford, Charles W. Craven, Philadelphia, for appellant.
Byron L. Milner, Theodore H. Lunine, Philadelphia, for Our Lady of Lourdes.
Charles W. Craven, (at No. 157), Jeffrey M. Stopford, (at No. 158), Philadelphia, for appellees.
Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

*5 OPINION OF THE COURT
HUTCHINSON, Justice.
This is a comparative negligence case.[1] Concepcion Rivera (plaintiff or Ms. Rivera) and the Philadelphia Theological Seminary of St. Charles Borromeo, Inc. (Seminary) cross appeal, by allowance, a Superior Court judgment reversing a judgment entered by the Philadelphia Court of Common Pleas on a jury verdict for the plaintiff and against the Seminary and Our Lady of Lourdes Catholic Church (Church). Superior Court awarded the Church and the Seminary a new trial on both liability and damage issues. We now modify Superior Court's order by reinstating the judgment entered against the Church and remanding the case to Common Pleas for a new trial limited to the issue of the Seminary's liability and, in the event of its liability, an apportionment of causal negligence between the Church and the Seminary.

I.
This case arose as a result of the accidental drowning of a twelve-year old boy, Frederick L. Rivera, in an indoor swimming pool owned by the Philadelphia Theological Seminary of St. Charles Borromeo, Inc. Rivera, a seventh grade altar boy from Our Lady of Lourdes Catholic Church, died during an evening swim party at the Seminary. The party was organized for the altar boys by Father Anthony Flynn, a priest then assigned to that Church.
Concepcion Rivera, the decedent's mother and administratrix of his estate, instituted these wrongful death and survival actions against the Church, the Seminary and Father Flynn. They were tried before a jury. It returned a *6 verdict in favor of the plaintiff finding the Church and Seminary 65% and 30% negligent, respectively.[2] In addition, the jury found the decedent 5% negligent.[3] The parties filed post-trial motions. The plaintiff sought judgment n.o.v. challenging the jury's determination that her son was contributorily negligent. The Seminary also sought judgment n.o.v. or, alternatively, a new trial on both the liability and damage issues. In addition, the Seminary claimed indemnification from the Church. The Church sought a judgment n.o.v. or a new trial on damages.[4] All of the above motions were denied by the Common Pleas Court, sitting en banc, and judgments were entered on the verdict.
All parties then cross-appealed to Superior Court. That court ruled that the jury could reasonably have found the decedent negligent and that, therefore, the trial court had properly denied plaintiff's motion for judgment n.o.v.
Before Superior Court, the Seminary argued that under the Act of February 2, 1966, P.L. (1965) 1860, 68 P.S. §§ 477-1-477-8 (Recreation Use Act),[5] it could be held liable *7 for Frederick Rivera's death only if the plaintiff proved its "wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity," 68 P.S. § 477-3, and that the plaintiff failed to meet its burden of proof on this issue. Superior Court rejected this argument holding that public bathing places and swimming pools do not fall within the purview of the Recreation Use Act but are, instead, subject to regulation by the Department of Environmental Resources (DER) under the Public Bathing Law, Act of June 23, 1931, P.L. 899, as amended, 35 P.S. §§ 672-680d,[6] and under which the Seminary might be found liable for violating the agency's regulations requiring lifeguards at all times when a public pool is open for use. Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc., 326 Pa.Superior Ct. 509, 474 A.2d 605 (1984).
Nevertheless, Superior Court ordered a new trial on the ground that the trial judge had issued erroneous and confusing instructions to the jury regarding the theories of negligence under which the plaintiff sought recovery from the Seminary for her son's death.[7] The court awarded a *8 new trial, generally, in favor of all parties on both liability and damage issues.[8]
Finally, even though none of the parties challenged the trial court's directed verdict in favor of Father Flynn, Superior Court raised that issue sua sponte and held that the lower court's dismissal of Father Flynn was a manifest abuse of discretion.
These cross appeals followed.[9] On this appeal, Ms. Rivera contends, first, that the Church should be bound by the judgment of liability entered against it because the Church appealed to Superior Court only from the damages award and because Superior Court's award of a new trial was based on trial error which affected the Seminary alone. Second, Ms. Rivera maintains that the Seminary's new trial *9 should be limited to relitigation of liability issues because the damages were fully and fairly litigated in the first trial.[10]
The Seminary contends, first, that it cannot be held liable for the death of Frederick Rivera because the Recreation Use Act provides it with immunity from common law liability on this record. In addition, the Seminary argues that, in promulgating regulations governing public pool safety, including the regulation requiring lifeguards, DER exceeded its statutory authority under the Public Bathing Law and, consequently, the regulations are invalid. The Seminary alternatively argues that the safety regulations are inconsistent with the Recreation Use Act, which imposes no affirmative duties on landowners and are, to that extent, invalid.[11]See 68 P.S. § 477-8.[12] In addition, the Seminary argues that the issue of Father Flynn's liability should be relitigated.[13] Finally, the Seminary reiterates its claim that it would be entitled to indemnification from the Church and Father Flynn if this Court does not absolve it from all liability and a jury on remand again imposes liability on it.
In summary, the evidence was sufficient to support the jury's finding that decedent was 5% negligent, and because the Church has not preserved any other liability issues it cannot contend that it was less than 65% negligent. We are thus required to determine (1) whether the Recreation Use Act provides immunity to the Seminary, (2) whether the Public Bathing Law applies and the regulations promulgated by DER pursuant to that law are valid, (3) *10 whether the issues of damages and of Father Flynn's liability should be relitigated, (4) whether the Seminary is entitled to a new trial on the issue of its liability, (5) if so, whether it is entitled to indemnification from the Church and Father Flynn, and (6) the scope of that trial.

II.
The evidence presented at trial established that no one saw Frederick Rivera go below the surface or otherwise experience difficulty in the water. Two boys present during the evening in question testified that they saw the decedent at the deep end of the pool. One testified that he saw Rivera "doggie paddling" near the diving board at the deep end. The boy asked Rivera if he was "all right" and the decedent responded affirmatively. Rivera's body was noticed on the bottom of the deep end of the pool at approximately 8:15 p.m., twenty minutes after the group entered the pool area. Father Flynn was not at the pool when the body was discovered but was, instead, in a nearby locker room where he had gone to get the phone number of the pizza shop he planned to take the boys to after the swim. No other adult was supervising the boys at that time. On being apprised of the situation, Father Flynn, who is an excellent swimmer and trained in water rescue, dove into the pool and retrieved Rivera's body. His attempts to revive the boy were unsuccessful.
The evidence indicated that Rivera was a poor swimmer who, during previous outings, had been restricted from entering water deeper than his height. The evidence further established that the pool depths were clearly marked and that Rivera's body was found in the area of the pool which was twelve feet deep and so marked.
Father Flynn brought the boys to the pool without having specifically obtained permission in advance from the Seminary or having otherwise notified them of the swimming party he had planned. It was his understanding that a priest, and any group of persons the priest invited, were *11 permitted to use the pool without obtaining prior permission from the Seminary.
Vincent Rossi, a lay teacher at Our Lady of Lourdes Catholic Church, testified that, from 1970 or 1971 to 1976, he brought groups of school children to the Seminary pool twice a week. Mr. Rossi further testified that he was not aware of any rules or regulations at all concerning the use of the pool, nor specifically of any rule requiring advance permission to either use it or prescribing hours during which the pool could be used by outside groups. Both defendants admitted that Father Flynn, a graduate of the Seminary, brought groups to the pool about 75 to 100 times during his tenure of four and one-half years at the Church and had organized similar excursions prior to his assignment with the defendant Church.
The entrance to the pool was locked when the boys, accompanied by Father Flynn and two parents, arrived at the Seminary at approximately 7:50 p.m. on the day in question. No Seminary personnel of any kind were present. Father Flynn, the boys and the father of one of the boys gained access to the building housing the pool by entering the Seminary's main entrance and then making their way through a labyrinth of halls. The group gained access to the pool itself through a fire door.[14]
Monsignor Burns, Rector of the Seminary at the time the drowning occurred, testified that people who wished to use the Seminary's pool, ordinarily, would telephone or write him for permission. He would, in turn, relay such requests to Father Hagan who, at that time, was responsible for scheduling the use of the pool by outside groups. Monsignor Burns further testified that the Seminary did not charge a fee for the use of its pool nor did it provide lifeguard service to outside groups.
Monsignor Burns also stated that in 1967 a memorandum was sent to all priests in the Archdiocese setting forth the *12 regulations governing the use of the Seminary's swimming pool. That memorandum, introduced at trial as Exhibit P-1, contained the following rule:
All groups visiting the Seminary pool must be accompanied by a priest or seminarian who will be responsible for their conduct while they are on the seminary premises. The priest or seminarian must remain with his group the whole time they are at the pool. No exceptions can be made to this rule.
N.T. 487 (emphasis in original). The memorandum, additionally, provided that there had to be one adult supervisor for every seven boys. Monsignor Burns testified that these rules were still in effect in 1976 but conceded that the rule governing adult supervision was not posted poolside and that the Seminary did not have a pool safety committee nor did it issue any further information regarding pool safety. Monsignor Burns further testified that the Dean of Students was responsible for enforcing the rules announced in the 1967 memorandum. However, Father Hagan, who held that position at the time Frederick Rivera died, testified that he had not actually seen the memorandum until it was shown to him at trial.

III.
We turn first to the Seminary's contention that its liability for young Rivera's death is precluded under the provisions of the Recreation Use Act. Specifically, the Seminary would have us construe the Act to immunize any owner of a swimming pool from liability so long as no admission fee is charged for its use. Both public policy and the legislative history of the Recreation Use Act show that it was not intended to, and should not, apply to immunize the Seminary from liability for negligence in the maintenance of its indoor swimming pool. The policy implications of such a result are so far-reaching and out of harmony, generally, with the modern trend in tort law[15] that we *13 cannot ascribe an intent to immunize owners of indoor pools from tort liability for foreseeable harm without a stronger indication of such intent than we can discern in this statute.
The stated purpose of the Recreation Use Act is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." 68 P.S. § 477-1. An owner of recreational land, as defined in the statute,[16] "owes no duty of care to keep the premises safe for entry or use by others for recreational purposes." 68 P.S. § 477-3. An owner who "directly or indirectly invites or permits without charge any person to use such property for recreational purposes" does not incur liability for injury to such persons, 68 P.S. § 477-4, except "[f]or wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." 68 P.S. § 477-6.
"Recreational purpose," under the Act, "includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, water sports and viewing or enjoying historical, archaeological, scenic, or scientific sites." 68 P.S. § 477-2.
In enacting the above statute, Pennsylvania's General Assembly adopted, essentially without change, a model act presented to the states by the Council of State Governments through their annual publication, Suggested State Legislation. The Recreation Use Act was presented to, and passed by, both houses of the Legislature without comment. The *14 purpose of proposing the model legislation was, however, explained in the following commentary accompanying the text of the model act:
Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public. The acquisition and operation of outdoor recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available. Where the owners of private land suitable for recreational use make it available on a business basis, there may be little reason to treat such owners and the facilities they provide in any way different from that customary for operators of private enterprises. However, in those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.
In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.
The suggested act which follows is designed to encourage availability of private lands by limiting the liability of owners to situations in which they are compensated for the use of their property and to those in which injury results from malicious or willful acts of the owner. In the case of lands leased to states or their political subdivisions for recreational purposes, the legislation expressly provides that the owner will have no remaining liability to recreationists, except as such liability may be incorporated in an agreement, or unless the owner is compensated *15 for the use of the land in addition to consideration for the lease.
The Council of State Governments, Public Recreation on Private Lands: Limitations on Liability, XXIV Suggested State Legislation 150, 150 (1965).
The Recreation Use Act is therefore designed to encourage the opening up of large, private land holdings for outdoor recreational use by the general public by limiting the liability of the landowner. Considering that purpose, we believe the Legislature intended to limit the meaning of the words "buildings, structures and machinery or equipment when attached to the realty" in Section 2 of the Act, 68 P.S. § 477-2, to ancillary structures attached to open space lands made available for recreation and not to enclosed recreational facilities in urban regions. Grammatically, this construction is indicated by the dual presence of the conjunctive "and" in the list, both before "buildings" as well as after "structures." The position of the limiting clause "when attached to the realty" at the end of the sentence is another such indication. All of these factors make it appropriate to treat the list beginning with the word "buildings" as a restrictive modifer of "land, roads, water, watercourses." Id.[17]
*16 The intention of the Legislature to limit the applicability of the Recreation Use Act to outdoor recreation on largely unimproved land is evident not only from the Act's stated purpose but also from the nature of the activities it listed as recreational purposes within the meaning of the statute. Specifically, with the exception of "swimming," which may be either an indoor or outdoor sport, the recreational activities enumerated in the statute are all pursued outdoors.
Moreover, while forty-six states, in addition to Pennsylvania, have enacted recreational use statutes,[18] we have been unable to find a single case in any of those jurisdictions in which an indoor recreational activity was held to fall within the purview of a recreational use act. In fact, most jurisdictions confronted with the question of whether a recreational use statute governs the liability of owners of even outdoor pools have ruled that it does not. See, e.g., Gibson v. Keith, 492 A.2d 241, 244 (Del.1985) (construing a statute identical to Pennsylvania's Recreation Use Statute and determining that it is "not applicable to urban or residential areas improved with swimming pools, tennis courts and the like"); Erickson v. Century Management Company et al., 154 Ga.App. 508, 268 S.E.2d 779 (1980) (statute does not encompass motel swimming pool but, instead, applies to larger bodies of water such as lakes and seashores even though "swimming" is listed in the statute among recreational purposes); Boileau v. DeCecco, 125 N.J.Super. 263, 310 A.2d 497 (1973), aff'd per curiam, 65 N.J. 234, 323 A.2d 449 (1974) (the legislature did not intend to grant tort immunity to owners of swimming pools in residential areas even though the statute includes "swimming" in its definition of sport and recreational activities). But cf. Blair v. *17 United States, 433 F.Supp. 217 (D.Nev.1977) (Nevada Sightseer Statute precludes liability for drowning in an outdoor pool constructed by private persons on land in a desolate area under the care and operation of the Bureau of Land Management).
Consequently, neither the language nor the purposes of the Recreation Use Act require a construction which applies its immunity to the Seminary's indoor pool. Instead, they induce us not to so construe it. Accordingly, we hold that the Seminary is not immune from tort liability under the provisions of Pennsylvania's Recreation Use Act.

IV.
In accord with this construction, Superior Court stated that "[t]o interpret the Recreational Use Act to apply to swimming pools so as to eliminate the need to exercise reasonable care in the operation and maintenance of pools regulated by authority of the Public Bathing Law, supra, would be unreasonable and absurd." Rivera, 326 Pa.Superior Ct. at 520, 474 A.2d at 611. Consequently, that court concluded that:
The operation of swimming pools is regulated by the Public Bathing Law and the regulations adopted thereunder; and one who fails to exercise due care in making the same safe for use can be made to respond in damages to one who has been injured as a result of negligence.
Id., 326 Pa.Superior Ct. at 521, 474 A.2d at 611.
The Seminary also challenges the holding that the Public Bathing Law applies, contending that it addresses only water cleanliness and that DER, in promulgating certain regulations, including that requiring lifeguards, exceeded the authority delegated to the agency under the statute.
The Public Bathing Law regulates "any place open to the public for amateur and professional swimming or recreative bathing, whether or not a fee is charged for admission. . . ." 35 P.S. § 673. Operators of such public bathing places are required to obtain a permit from DER, 35 P.S. § 676, and to keep the water clean and sanitary at all times. 35 P.S. *18 § 675. Violation of the statute's provisions constitutes a summary offense. 35 P.S. § 680d.
In 1971, DER issued regulations pursuant to the Public Bathing Law setting forth permit requirements and water quality and hygiene and safety standards for public bathing places. See 25 Pa.Code §§ 193.1-193.94. In 1974, the Department issued regulations requiring public bathing places "to reduce to a practical minimum the danger of injury to persons from drowning, falls, collisions, fires, nuisances, or hazard of any kind," 25 Pa.Code § 193.41, and to have "[o]ne or more competent lifeguards in adequate number. . . on duty . . . at all times the public bathing place is open to use. . . ." 25 Pa.Code § 193.42.
We do not quarrel with the Seminary's argument that administrative agencies may exercise only the powers and authority conferred on them either expressly, or by necessary implication, by the Legislature. Commonwealth v. Butler County Mushroom Farm, 499 Pa. 509, 513, 454 A.2d 1, 4 (1982); Commonwealth v. J. & A. Moeschlin, Inc., 314 Pa. 34, 170 A. 119 (1934); Day v. Public Service Commission, 312 Pa. 381, 167 A. 565 (1933). "`The power and authority to be exercised by administrative commissions must be conferred by legislative language clear and unmistakable. A doubtful power does not exist. Such tribunals are extra judicial. They should act within the strict and exact limits defined.'" Pennsylvania Human Relations Commission v. St. Joe Minerals Corporation, 476 Pa. 302, 310, 382 A.2d 731, 735-36 (1978) (quoting Green v. Milk Control Commission, 340 Pa. 1, 3, 16 A.2d 9, 9 (1940)). Substantive rulemaking by administrative agencies is proper provided that the statutory delegation of power can reasonably be construed as authorizing it. Hospital Association of Pennsylvania v. MacLeod, 487 Pa. 516, 521, 410 A.2d 731, 733 (1980). These principles are well established.
Because the Public Bathing Law addresses only water quality and hygiene in public bathing places and does not address any other types of hazards to health and safety, the Seminary goes on to argue that the law cannot reasonably *19 be construed as conferring authority on DER to promulgate the regulations governing safety, generally, set forth in 25 Pa.Code §§ 193.41-193.45. However, on this record, the content of the current regulations makes it unnecessary for us to reach the question of DER's authority over safety matters.
Even if we were to conclude that DER exceeded its statutory authority in issuing regulations requiring life-guards and other general safety precautions in public bathing places, the outcome in this case would not be affected because the regulations at issue do no more than illustrate in general common sense terms those precautions the standard of due care requires of owners of public bathing establishments under the common law. See, e.g., Cummings v. Nazareth Borough, 427 Pa. 14, 18, 233 A.2d 874, 877 (1967) ("[w]herever people publicly congregate to swim, dive and divert themselves in the water, a lifeguard is a compelling necessity"). Therefore, any error by the trial judge in instructing the jury that liability for Frederick Rivera's death could be predicated on violations of DER's regulations is harmless. On this record, nothing more is required than a correct instruction on the common law requirement of due care, as applied to swimming pools. Reference to the regulatory requirements is redundant and unnecessary.

V.
Nevertheless, Superior Court correctly awarded the Seminary a new trial because the trial judge's instructions regarding the duty owed the public by the Seminary under the Public Bathing Law were contradictory and generally confusing. Specifically, the trial court instructed the jury, in pertinent part, as follows:
The Seminary swimming pool was a public swimming pool governed by the Pennsylvania Public Bathing Law. Under the Public Bathing Law, the Seminary had a duty to equip, operate and maintain its pool so as to reduce to a practical minimum the danger of injury to persons from *20 drowning, falls, collisions, fires, nuisances, and other hazards of any kind.
. . . .
There is also a provision with respect to lifeguards: one or more competent lifeguards in adequate number shall be on duty at the water side at all times the public bathing place is open to use by bathers and shall not be assigned other tasks which will divert their attention from the safety of the bathers.
Lifeguards must be capable swimmers and so forth.
I don't believe it is argued that, in the circumstances of this case, the Seminary was required to have a lifeguard present.
The argument, as I understand it, is that they had regulations, which is P-1, which you will have, and they were formulated back in 1967, but were not posted and apparently not known to the present Seminary authorities and/or Father Flynn.
But the position, I believe, is that there had to either be a lifeguard there, provided by the Seminary, if they knew or had reason to believe that children would be using the pool, or people would be using the pool, and/or, two, that they had a duty to supervise the use of the pool, particularly in the sense of requiring that there be a competent person or persons in charge of the outings such as these altar boys had that evening.
It has been pointed out that Father Flynn met all the qualifications of the Act of Assembly from the standpoint of experience. He had the necessary certification both in, I think, life saving and safety. But, then, there is a question of not only whether this was adequate supervision, but whether or not Father Flynn adequately performed his responsibilities as the one in charge of these children.
N.T. 707-08. We agree with Superior Court that the above instructions "were incomprehensible and of little or no value in assisting the jury to determine the nature of the duty owed to the decedent by the Seminary," Rivera, 326 *21 Pa.Superior Ct. at 525, 474 A.2d at 613,[19] and with its conclusion that, consequently, the Seminary must be granted a new trial. See Hamil v. Bashline, 481 Pa. 256, 275, 392 A.2d 1280, 1289-90 (1978); Smith v. Clark, 411 Pa. 142, 147, 190 A.2d 441, 443 (1963).[20]

VI.
The grant of a new trial ordinarily "means a new trial generally; it restores a case to the status it had before the trial took place and is fully open to be tried de novo as to all parties and all issues." Mains v. Moore, 189 Pa.Superior Ct. 430, 434, 150 A.2d 549, 551 (1959). See Pennsylvania Co. for Insurances on Lives v. Lynch, 308 Pa. 23, 28, 162 A. 157, 158-59 (1932). In addition, a court may, sua sponte, order a new trial as to all parties, including those who have not appealed the judgment against them. Bergen v. Lit Bros., 354 Pa. 535, 47 A.2d 671, (1946). However, under the circumstances of this case, we believe Superior Court erred in fully opening up the case to a new trial.
We note, preliminarily, that Superior Court erred in sua sponte reversing the directed verdict in favor of Father Flynn since none of the parties challenged his dismissal on appeal to that court. In our adversarial system, the parties' judgment on these matters must be respected and a failure to make timely objection waives the issue. Dilliplaine v. Lehigh Valley Trust Co., 457 Pa. 255, 322 A.2d 114 (1974). Moreover, in the instant case, it is not necessary to reinstate Father Flynn as a party defendant in order to fairly resolve the outstanding issues among the other parties. *22 When one defendant's tort liability is vicariously based on respondeat superior, the other parties are not initially required to pursue their rights of recovery, contribution or indemnification from the servant whose operative negligence led to the plaintiff's injury by joining that servant. See Betcher v. McChesney, 255 Pa. 394, 100 A. 124 (1917). It should not matter whether the decision to forego those rights is made at the outset of the case, or during its pendency. Therefore, we reverse Superior Court on this issue and reinstate the trial court's order dismissing Father Flynn from this case.
During the course of these proceedings the Church and Seminary challenged the damage award in several respects. Specifically, they argued, first, that the trial court erred in admitting evidence of fringe benefits as an item of damages and, second, that this Court should re-examine its decisions which hold that "[i]ncome tax as it relates to damages should be mentioned neither in argument nor in jury instructions." Gradel v. Inouye, 491 Pa. 534, 547, 421 A.2d 674, 680 (1980).
We believe the trial court correctly resolved the fringe benefits issue against the Seminary and Church. See Rivera v. The Philadelphia Seminary of St. Charles Borromeo, 7 Phila. 358, 382-84 (1977). In addition, we see no reason to re-evaluate our case law which holds that income tax consequences are not considered "`in fixing damages for the determination of decedent's earning capacity.'" Gradel v. Inouye, 491 Pa. at 547, 421 A.2d at 680 (quoting Girard Trust Corn Exchange Bank v. Philadelphia Transportation Co., 410 Pa. 530, 538, 190 A.2d 293, 298 (1963)).
In conclusion, we find no error in the proof or calculation of the damages to which Mrs. Rivera is entitled warranting a new trial. The issues relating to plaintiff's damages were fully and fairly litigated. Since that is so, we see no need to retry the liability of the Church to the plaintiff. As stated, the Church did not preserve the issue of its proportionate liability. The trial judge's erroneous *23 instructions resulted in prejudice only to the Seminary. Under these circumstances the appellant should not be deprived of her verdict against the Church simply because the Seminary has been awarded a new trial. The Church, therefore, is not prejudiced by our permitting plaintiff to recover her judgment from it. The Church's minimum proportionate percentage of liability and the amount of plaintiff's damages award reduced by decedent's 5% comparative negligence have been finally determined. The Church has not preserved the right to question the jury's attribution to it of 65% of the total negligence or 68.4% relative to the Seminary. The Church retains the right to pursue contribution from the Seminary provided the new trial results in a determination that the Seminary was in some degree causally negligent. However, that degree cannot exceed 30% of the total, or 31.6% vis a vis the Church.[21]
Our determination that this appellant is entitled to retain her verdict is consistent with our cases which hold that:
[H]aving secured a verdict against one of two alleged tortfeasors, a plaintiff should not be denied his verdict *24 because the court is of the opinion that the verdict should also have been against the co-defendants who were exculpated: Trerotola v. Philadelphia, 346 Pa. 222, 226, 227, 29 A.2d 788; Felo v. Kroger Grocery & Baking Co., 347 Pa. 142, 145, 31 A.2d 552; Frank v. W.S. Losier & Co., Inc., 361 Pa. 272, 277, 64 A.2d 829; Ratcliff v. Myers, 382 Pa. 196, 202, 113 A.2d 558. See: 6A Stand.Pa.Prac. 161. This is especially true where the action is severable as well as joint: Bailey v. C. Lewis Lavine, Inc., 302 Pa. 273, 278, 153 A. 422. See: 39 Am.Jur. 49, New Trial § 25.
McArthur v. Balas, 402 Pa. 116, 122-23, 166 A.2d 640, 643 (1961).
`Where the cause of action is joint and several, a trial court may enter judgment on a joint verdict against one defendant and grant a new trial as to the other. . . . It is not easy to perceive . . . why the plaintiff should be compelled to lose her judgment against a portion [of the defendants] because it appears that the others are entitled to a new trial.'
Trerotola v. Philadelphia, 346 Pa. 222, 227, 29 A.2d 788, 790 (1943) (quoting Bailey v. C. Lewis Lavine, Inc., 302 Pa. 273, 277-78, 153 A. 422, 423 (1931)). See also Tonsic v. Wagner, 458 Pa. 246, 329 A.2d 497 (1974); Ratcliff v. Myers, 382 Pa. 196, 113 A.2d 558 (1955).[22] The reasoning of this line of cases, all of which involved a party defendant who was improperly exonerated in the original trial, applies with even greater force to cases, such as the one presently before us, in which both defendants, including the one who *25 has been awarded a new trial, were found liable in the original trial. The fact that the instant action is governed by a comparative negligence statute should not change these results.[23]See, e.g., Thompson v. City of Philadelphia, 507 Pa. 592, 493 A.2d 669 (1985) (although each of three defendants was found by jury to be liable to some extent, jury's apportionment of liability was against the weight of the evidence; grant of new trial was properly limited to apportionment of negligence against the defendants and retrial of plaintiff's verdict was not necessary). If a new trial must be granted as to all parties and all issues under the circumstances of this case, then in every case involving multiple defendants, no issue pertaining to any one defendant could be resolved unless and until there was an error-free trial as to all defendants. Such a result is not in the interest of justice and judicial economy.
The Seminary is the only party defendant which continues to contest the judgment apportioning a percentage of liability to it on the basis of comparative negligence. Superior Court accepted its contention and properly found prejudicial error in the trial court's instructions on the Seminary's liability. We perceive no injustice in requiring a new trial solely for the purpose of determining the Seminary's proportionate responsibility to the Church, if any. We believe that a new trial for this purpose effectuates a just and fair result for all parties involved and will, at the same time, encourage, not inhibit, the prompt resolution of claims.

*26 VII.
Finally, the Seminary seeks indemnification from the Church.[24] Superior Court did not address this issue, having remanded for a new trial.
There is no indemnity contract in this case. An implied contract to indemnify cannot come into existence until the Seminary has been found liable to plaintiff and has discharged the obligation which arises out of that liability. The Seminary's right to indemnification, if any, must be determined in the new trial. It can be based only upon a determination that as between the Seminary and the Church, the Church was primarily responsible for discharging the obligation to pay plaintiff's judgment. See Burbage v. Boiler Engineering & Supply Co., Inc., 433 Pa. 319, 249 A.2d 563 (1969).
In summary, we hold that the Recreation Use Act does not apply in the circumstances of this case, and the Seminary, therefore, is not immune from liability. The Public Bathing Law does apply; however, because it was not necessary to reach the question of DER's authority over safety matters, the jury, if any, at the new trial should be instructed as to the standard of due care required of owners of public bathing establishments under the common law. At the new trial between the Seminary and the Church, the Church, which has been properly found liable to the plaintiff, will have the burden of proving the Seminary's causal negligence, if any. The plaintiff may participate in the new trial if she so chooses to protect any interest she may have in preserving a right to collect her judgment from the Seminary.
Superior Court's order remanding the record to Common Pleas for a new trial as to all parties on all issues is modified by limiting the new trial to the Seminary's proportionate liability, if any, in the damage judgment Common Pleas has entered on the jury verdict for plaintiff and the Seminary's right to indemnity from the Church for any payment it may be required to make.
*27 The judgment of Common Pleas as to the proportionate liability of plaintiff and the Church, and as to the amount of damages allowed to plaintiff, is reinstated.
NIX, C.J., files a Dissenting Opinion in which McDERMOTT and ZAPPALA, JJ., join.
McDERMOTT, J., files a Dissenting Opinion in which NIX, C.J., and ZAPPALA, J., join.
NIX, Chief Justice, dissenting.
I respectfully dissent from the majority's position and conclude that the Recreation Use of Land and Water Act, Act of February 2, 1966, P.L. 1860, § 1 et seq., 68 P.S. § 477-1 et seq., is applicable to the instant action involving the St. Charles Seminary.
The majority reaches a contrary result by concluding, "[b]oth public policy and the legislative history of the Recreation Use Act show that it was not intended to, and should not, apply to immunize the Seminary from liability for negligence in the maintenance of its indoor swimming pool." In my judgment the clear language of the Act, the legislative history, as well as the Act's stated purpose clearly indicates otherwise.
The focal point of any statutory interpretation must be the language of the statute itself. 1 Pa.C.S. § 1939. "When the words of the statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). See also In re Fox's Estate, 494 Pa. 584, 431 A.2d 1008 (1981); Hellertown Mfg. Co. v. Commonwealth, 480 Pa. 358, 390 A.2d 732 (1978).
Section one of the Act states that its legislative purpose is to encourage owners of land to make available to the public certain areas for recreational purposes. 68 P.S. § 477-1.[1] *28 It further states that such owners would incur limited liability towards persons entering thereon for such purposes. Id. The operative words of the statute are defined in section two, 68 P.S. § 477-2, which reads as follows:
§ 477-2. Definitions
As used in this act:
(1) "Land" means land, roads, water, watercourses, private ways and buildings, structures and machinery or equipment when attached to the realty.
(2) "Owner" means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises.
(3) "Recreational purpose" includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiiing, water sports and viewing or enjoying historical, archaeological, scenic, or scientific sites.
(4) "Charge" means the admission price or fee asked in return for invitation or permission to enter or go upon the land.
Both the majority opinion[2] and appellee maintain that the Seminary, an urban building, does not fall within the scope *29 of the Act. The Superior Court took the contrary view and concluded that an urban building could fall within the scope of the Act. However, they reasoned that since a swimming pool is not expressly included under the terms of the Act it did not fall within the scope of the Act's provisions.[3] My reading of the language of the Act suggests that these views are in error.
The Seminary as owner, possesses a fee simple interest in its building. In that building there is a structure, a swimming pool, to which the Seminary invited free of "charge" members of the general public[4] to engage in the recreational activity of swimming.
As the Superior Court aptly noted:
There is nothing unreasonable about applying the limited liability decreed by the legislature in a uniform manner to lands, whether urban, suburban or rural, which are made available for recreational use without charge. The broad language adopted by the legislature suggests most strongly that the legislature deemed the need for recreational lands in urban centers to be as great as the need therefor in rural areas of the State.

Rivera v. Philadelphia Theological Seminary, 326 Pa. Super. 509, 521-522, 474 A.2d 605, 611 (1984).
The above excerpt reflects the view expressed by J. Barrett in his analysis of a more restrictive statute than our Act. The Barrett reasoning is even more impressive where *30 our legislature has intentionally provided wider coverage than traditionally accorded in this area.
. . . There is little doubt that overpopulation and increased leisure time have added to the pressures on publicly owned recreation areas in the past two decades. National and state parks are crowded, . . ., and the playthings of our mechanized society are invading the remaining open spaces with bewildering speed. Despite a resurgent interest in adding new lands to the national park system, current forecasts predict little improvement in recreational opportunities absent the contribution of private landowners. Thus, there is an objective basis for the aim of recreational use acts: to promote increased public access to private lands by reducing the liability of landowners and occupiers. The degree to which owners and occupiers in fact open their lands will depend largely on how effectively this legislation relieves them of their common law duty of care. (footnotes omitted)
J. Barrett, Good Sports and Bad Lands: The Application of Washington's Recreation Use Statute Limiting Landowner Liability, 53 Wash.L.Rev. 1, 4-5 (1977).
An attempt to create an artificial exclusion to limit the owners of private property who would choose to open their lands for recreational purposes merely because the property is situated in an urban area, undercuts legislation such as the Act and frustrates the salutory purposes sought to be achieved.
Thus, because the Seminary is a building located in an urban area, it does not follow that the Seminary is not covered by the Act. Nowhere is it expressly stated in the Act that the recreational use must occur outdoors. I therefore believe it improper to create such a limitation by judicial fiat.
Moreover, contrary to the conclusion reached by the Superior Court, it is not necessary that the Act specifically enumerate swimming pool in order for that structure to be included within the scope of the Act. It is clear that the legislature intended to use the term "structure" in accordance *31 with its normal and accepted usage. 1 Pa.C.S. § 1903(a). If "structures" was intended to convey a special meaning for the purposes of this Act, it would have been included in the definitional section, 68 P.S. § 477-2, supra, where that limited meaning could have been specified. The Act lists swimming as one of the recreational purposes. 68 P.S. § 477-2(3). A swimming pool is a location where that activity frequently occurs. It is difficult to accept that the legislature intended to exclude this use from the language used in the Act. In interpreting statutes, we are obligated to avoid strained results. 1 Pa.C.S. § 1922(1). I thus conclude that the Act, by its clear terms, is applicable to the St. Charles Seminary.
In so concluding I must reject the result reached by the Superior Court that the regulations promulgated by the Department of Environmental Resources (DER) under the Public Bathing Law, Act of June 23, 1931, P.C. 899, as amended, 35 P.S. §§ 672-680d, supersede the Recreation Use of Land and Water Act. The majority raises the possibility that the DER regulations passed in 1974, 25 Pa.Code § 193.1 et seq., may be invalid because they exceed the scope of the enabling statute, the Public Bathing Law, supra. However, the majority does not resolve this issue but resorts instead to the common law. I believe that here the administrative agency not only went beyond the scope of statute itself, but also intruded upon an area in which there is express legislation. I am thus constrained to conclude that the regulations are not controlling in the instant case. Regulations passed by an administrative agency cannot supersede or repeal a statute passed by the legislature. Public policy is to be articulated by the legislature and not the agencies. See Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission, 471 Pa. 347, 370 A.2d 337, 339-40 (1977); Drexelbrook Associates v. Public Utility Commission, 418 Pa. 430, 212 A.2d 237 (1965). Hence, the DER regulations of 1974 cannot supersede the Recreation Use of Land and Water *32 Act of 1966 which itself repealed all inconsistent acts or parts of acts. 68 P.S. § 477-8.
Even if resort to legislative intent is required, we also must reach the conclusion that the Recreation Use of Land and Water Act is controlling. The Recreation Use of Land and Water Act of 1966 repealed and replaced the Act of September 27, 1961, P.L. 1696, which limited the "liability of landowners of agricultural lands or woodlands" for "personal injuries while hunting or fishing." The new 1966 statute broadened its coverage to include "land, roads, water, watercourses, private ways and buildings, structures and machinery or equipment when attached to the realty." 68 P.S. § 477-2(1). The 1966 Act also enlarged upon the activities encompassed in the term "recreational purpose." See 68 P.S. § 477-2(3). The 1966 Act thus eliminated the prior geographical and recreational use limitations. It is a rule of statutory construction that a change in the language of a statute reflects a corresponding change in legislative intent. Masland v. Bachman, 473 Pa. 280, 289, 374 A.2d 517, 521 (1977); Haughey v. Dillon, 379 Pa. 1, 6, 108 A.2d 69, 72 (1954); Commonwealth v. Lowe Coal Co., 296 Pa. 359, 365, 145 A. 916, 918 (1929). By removing the former restrictive language, the legislature gave a clear signal that it intended to broaden the scope of immunity created under the Act.
Since the evidence presented at trial did not show that the St. Charles Seminary engaged in any willful or malicious conduct, 68 P.S. § 477-6,[5] I would hold that judgment n.o.v. should have been entered in favor of the Seminary.
*33 Accordingly, I would remand for a new trial to reassess the comparative negligence of the remaining parties, the decedent and Our Lady of Lourdes Catholic Church.[6]
McDERMOTT and ZAPPALA, JJ., join in this dissenting opinion.
McDERMOTT, Justice, dissenting.
I join the Chief Justice in his reasons for dissent. As the majority notes, the Act granting immunity when land and facilities are offered free for charitable, recreational and instructional purposes was passed by the legislature without comment. The majority then offers the comments of the drafters of the model Recreation Use Act as a basis for their holding. The essence of that commentary and general purpose is in the following:
. . . [I]n those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.
In something less than one-third of the states, legislation has been enacted limiting the liability of private owners who make their premises available for one or more public recreational uses. This is done on the theory that it is not reasonable to expect such owners to undergo the risks of liability for injury to persons and property attendant upon the use of their land by strangers from whom the accommodating owner receives no compensation or other favor in return.
The Council of State Governments, Public Recreation on Private Lands: Limitations of Liability, XXIV Suggested State Legislation 150, 150 (1965).
The majority however, eschewing the clear intent of the General Assembly, ignores the obvious fact that the legislature, *34 without comment, in plain words and intention, did not mean to exclude those who cannot walk out their back door through leafy lanes to shining lakes, from the charity of those who offer indoor swimming pools in the hot and dusty city. The argument that they are excluded because they are easily supervised is ludicrous.
There is unexpected danger inherent in all recreational activities, whether it be the wild danger of the outback or a slip on a marble floor. The whole concept of immunity is the presence of danger. To say that a pond, lake, quarry, brook or swimming pool across a city line is immune when offered free to the public, but the same in an urban area is not, however comparable in size and danger, because it has a roof, is simply whimsical. The legislature balanced danger against a benefit to a great number of people; allowing a use of facilities with immunity from liability, great and small, so that many could have, what the possible consequences for an injury to one, would make improvident to give to any.
NIX, C.J., and ZAPPALA, J., join this dissenting opinion.
NOTES
[1] The comparative negligence statute in effect at the time this action arose was the Act of July 9, 1976, P.L. 855, 17 P.S. §§ 2101 and 2102, which was repealed by Section 2(a) of the Judiciary Act Repealer Act (JARA), Act of April 28, 1978, P.L. 202, 42 P.S. § 20002(a) [1976], eff. June 27, 1978. This statute was substantially reenacted by Section 10(89) of JARA and is now found at 42 Pa.C.S. § 7102. The accident which resulted in the death of plaintiff's decedent occurred December 17, 1976.
[2] The trial judge had directed a verdict in favor of Father Flynn at the conclusion of the parties' presentation of the evidence. None of the remaining parties challenged this order in their post-trial motions.
[3] Damages were assessed at $1,225.80 in the wrongful death action, Section 1 of the Act of April 26, 1855, P.L. 309, as amended, 12 P.S. § 1602, repealed by Section 2(a) of JARA, 42 P.S. § 20002(a) [310], and Section 1 of the Act of May 13, 1927, P.L. 992, 12 P.S. § 1604, repealed by Section 2(a) of JARA, 42 P.S. § 20002(a) [1094] (similar provisions are now found at Section 8301 of the Judicial Code, 42 Pa.C.S. § 8301). Damages in the survival action, Section 2 of the Probate, Estates and Fiduciaries Code, as amended, 20 Pa.C.S. § 3371, were assessed at $942,400.00. After adding delay damages pursuant to Pa.R.C.P. 238, and reducing the total amount of the awards by 5%, the trial court entered a verdict for the plaintiff in the amount of $1,345.01 in the wrongful death action and $1,034,048.40 in the survival action.
[4] In its motion for a new trial the Church requested a new trial on "the issues of liability and/or damages." However, its accompanying supporting memorandum raises issues related exclusively to damages. In addition, in its appeal before Superior Court, the Church presented argument only on the damage issues.
[5] The Recreation Use Act repealed and replaced the Act of September 27, 1961, P.L. 1696, which had limited the "liability of landowners of agricultural lands or woodlands for personal injuries suffered by any person while hunting or fishing upon the landowner's property."
[6] The functions, powers and duties under the Public Bathing Law, originally conferred on the Department of Health, were transferred to the Department of Environmental Resources in 1970. See 71 P.S. § 510-1(9).
[7] At trial, the plaintiff advanced three theories of negligence under which she sought to have the Seminary held liable for her son's death. The first was the Seminary's alleged violation of a regulation promulgated by the Department of Environmental Resources, 25 Pa.Code § 193.42, pursuant to the Public Bathing Law, supra, requiring life-guards at public swimming pools at all times during which they are open for use. The second theory was that the Seminary had violated the common law duty owed by an owner or occupier of land. Finally, the plaintiff sought recovery from the Seminary for alleged breach of the common law duty described in the Restatement (Second) of Torts § 323 (1965) as follows:

§ 323. Negligent Performance of Undertaking to Render Services One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.
The trial court instructed the jury that recovery against the Seminary could be predicated on any one of the above theories of liability. Superior Court held that Section 323 had no application to the facts of this case and that the trial judge committed reversible error in charging the jury thereon. In addition, Superior Court determined that the trial court's instructions concerning the Seminary's duty to provide lifeguard protection were confusing.
[8] Because Superior Court awarded a new trial, it did not rule on the Church's assignments of trial error concerning the plaintiff's proof of damages made by both defendants. However, the court did discuss the damage issues raised by the defendants for the purpose of providing guidance to the trial court on remand. The court did not address the Seminary's indemnity claim.

The award of a new trial as to the liability of the Church went beyond the remedy requested by the Church, which argued only as to damages. Although the Church now challenges Ms. Rivera's position and argues that we must affirm Superior Court's award of a new trial as to all parties on all issues, the Church has waived its right to contest Common Pleas' judgment that it was 65% liable by failing to preserve that issue before Superior Court. The fact that Superior Court granted the Church more than it asked for cannot revive an issue which the Church failed to argue.
[9] The Church did not petition this Court for allowance to appeal from Superior Court's order.
[10] Additionally, Ms. Rivera contends that the Seminary and the Church failed to produce sufficient evidence to submit the question of her son's contributory negligence to the jury. Our review of the record shows that this contention is without merit. There was no error and we will not address this issue further.
[11] The City of Philadelphia, amicus curiae, has filed a brief in which it supports the Seminary's position.
[12] This section provides, in pertinent part, that "[a]ll other acts or parts of acts are repealed insofar as inconsistent herewith." 68 P.S. § 477-8.
[13] This issue was raised sua sponte by Superior Court, but was not preserved by any of the parties.
[14] Apparently, the parent accompanying the group to the pool area agreed to help Father Flynn supervise the boys but then immediately left the building to get a pack of cigarettes.
[15] See Specter v. Commonwealth, 462 Pa. 474, 479, 341 A.2d 481, 483 (1975) (it has been the "trend in recent years to do away with immunities from suit which are neither constitutionally or statutorily compelled"); Boileau v. DeCecco, 125 N.J.Super. 263, 266, 310 A.2d 497, 499 (1973), aff'd per curiam, 65 N.J. 234, 323 A.2d 449 (1974) (construing a statute similar to Pennsylvania's Recreation Use Statute and observing that "[t]he trend in public policy has been to expand the areas of tort liability and to eliminate islands of immunity.").
[16] For purposes of the Act: "`[1] and' means land, roads, water, watercourses, private ways and buildings, structures and machinery or equipment when attached to the realty," and "`[o]wner' means the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises." 68 P.S. § 477-2.
[17] The need to limit owner liability derives from the impracticability of keeping large tracts of largely undeveloped land safe for public use. The same need does not arise in the case of indoor recreational facilities which, in contrast, are relatively easy to supervise and monitor for safety hazards. See, e.g., Harrison v. Middlesex Water Co., 80 N.J. 391, 403 A.2d 910 (1979) (New Jersey's act applies specifically to certain enumerated outdoor activities which, ordinarily, can be accommodated only on large sized tracts of rural or semi-rural lands which are difficult to defend from trespassers and to make safe for invited persons engaging in recreational activity); Tijerina v. Cornelius Christian Church, 273 Or. 58, 539 P.2d 634 (1975) (Oregon act applies to landholdings which have recreational value but are not susceptible to adequate policing or curing of dangerous conditions). See also Barrett, Good Sports and Bad Lands: The Application of Washington's Recreational Use Statute Limiting Landowner Liability, 53 Wash.L.R. 1, 23 (1977) ("the amount of land owned by the defendant is important in determining whether the maintenance of safe conditions or adequate warning signs is practical[;] [f]airgrounds, a lakeside resort, a military reservation, and a twenty-seven acre pond have all been found within the intended scope of state recreational use statutes [while] an abandoned barge, a residential swimming pool, and a three-acre ball field have been held to be beyond the reach of such statutes" (footnotes omitted)).
[18] See Gibson v. Keith, 492 A.2d 241 (Del.1985) (comparing Delaware recreational use statute with those enacted in other jurisdictions).

The following states, in addition to Pennsylvania, have adopted the model act virtually verbatim: Arkansas, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Maryland, Minnesota, Nebraska, Oregon, South Carolina and Utah.
[19] That determination is not dependent on the instruction's reference to the Public Bathing Law. The common law requires lifeguards under appropriate circumstances. The issue is whether the circumstances here required a lifeguard and it is on that point and Father Flynn's role in meeting any such requirement that the confusion occurs.
[20] Because we have decided that the Seminary is entitled to a new trial, we note our agreement with the conclusion reached by both lower courts that the Restatement (Second) of Torts § 323 (1965) is inapplicable to the facts of this case. See n. 7 at 4. See also DeJesus v. Liberty Mutual Insurance Company, 423 Pa. 198, 200-01, 223 A.2d 849, 850 (1966).
[21] The comparative negligence statute in effect at the time this action arose, see n. 1 supra, provided:

Section 1. Comparative Negligence.  In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendant against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.
Section 2. Recovery Against Joint Defendant; Contribution.  Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed.
The plaintiff may recover the full amount of the allowed recovery from any defendant against whom such plaintiff is not barred from recovery. Any defendant who is so compelled to pay more than his percentage share may seek contribution.
17 P.S. §§ 2101 and 2102.
[22] These cases, as well as the instant case, are distinguishable from the line of cases, arising from vehicular accidents and involving multiple defendants, in which the court, finding trial error or determining that the jury's verdict as to one but not all defendants was against the weight of the evidence, awarded a new trial as to all defendants reasoning that "[i]n weighing the question of responsibility for the accident a jury cannot fairly dispose of the case without having both parties before it so as to enable it to determine which of the operators was negligent, or whether both were at fault[.]" Nebel v. Burrelli, 352 Pa. 70, 75, 41 A.2d 873, 875 (1945). Accord Miller v. Pennsylvania Railroad Company, 368 Pa. 507, 515-16, 84 A.2d 200, 204 (1951). See Biehl v. Rafferty, 349 Pa. 493, 37 A.2d 729 (1944).
[23] Our conclusion that the plaintiff is entitled to retain her verdict against the Church is in keeping with the purpose of permissive joinder. For example, in Meyer v. Heilman, 503 Pa. 472, 469 A.2d 1037 (1983), we held that where the improper granting of a compulsory non-suit as to one defendant did not cast serious doubt on the jury's verdict in favor of its co-defendant, it would be improper to subject the co-defendant to a second trial. In so holding, we noted that permissive joinder under Pa.R.C.P. 2229(b) "does not alter the nature of the cause of action against the individual defendants." Id., 503 Pa. at 479, 469 A.2d at 1041.
[24] As stated above, Superior Court erred in reversing the directed verdict in favor of Father Flynn.
[1] § 477-1. Purpose; liability

The purpose of this act is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.
[2] In its attempt to ignore the plain meaning of section 477-2(1), the majority engages in what can only be described as creative grammar. Section 2(1) first defines land to include "land, roads, water, watercourses, private ways and buildings, . . . ." There is nothing which logically suggests, as the majority concludes, that the word "buildings" is a restrictive modifier of "land, roads, water, watercourses." In fact it is mind-boggling to imagine how "buildings" could modify land, roads, water or watercourses. The definition of land in section 2(1) then continues with "structures and machinery or equipment when attached to the realty." The phrase "when attached to the realty" modifies structures, machinery and equipment. This interpretation is congruent with the rest of the statute because it places the requirement that the structure, machinery or equipment be part of real property. There is no requirement that the structure, machinery or equipment be located outdoors, only a requirement that they are affixed to the realty, which entails the possibility that the structure is located in the building.
[3] The Superior Court was of the view that since the Public Bathing Law, Act of June 23, 1931, P.L. 899, as amended, 35 P.S. §§ 672-680d, specifically applied to swimming facilities, coupled with the omission of a specific reference to swimming pools in the Recreational Act, an inference that the latter did not intend to include swimming pools within its scope was justified.
[4] It has been accepted as factually true throughout this matter that the indoor swimming pool owned and maintained by the Seminary was available for use without restriction to any group, Catholic or otherwise. The evidence also indicated that the Seminary also provided use of the pool regularly to "Camp Overbrook" for inner-city children during the summer months. On the average it was estimated that free use of the pool occurred 18 to 20 times a month during the summer months by various groups of children.
[5] Section 477-6 states in relevant part:

Nothing in this act limits in any way any liability which otherwise exists:
(1) For wilful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity.
68 P.S. § 477-6(1).
[6] I agree with the majority's conclusion that since none of the parties challenged the trial court's directed verdict in favor of Father Flynn, the Superior Court improperly joined Father Flynn as a party in the new trial. Since I have determined that the Seminary should not have been found liable under a theory of negligence in the first trial, it is now necessary on remand to have the liabilities assessed between the remaining parties independent of the original comparative negligence allocations.