ROSE CASSIO, SPECIAL ADMINISTRATOR OF THE ESTATE OF
MICHAEL R. CASSIO, DECEASED, APPELLANT AND
CROSS-APPELLEE, V. CREIGHTON UNIVERSITY, A NONPROFIT
CORPORATION, APPELLEE AND CROSS-APPELLANT.
446 N.W.2d 704

Filed August 11, 1989.    No. 87-310.

Debra R. Nickels and James R. Welsh, of Welsh & Sibbernsen, for appellant.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Plaintiff, special administrator of the estate of Michael R. Cassio, Cassio's sister, appeals from the order of the district court granting defendant Creighton University's motion for a new trial. This followed a jury verdict in favor of the plaintiff in a wrongful death action in the amount of $118,940. Creighton cross-appeals from the rulings of the district court overruling its motions for directed verdict and judgment notwithstanding the verdict.

Plaintiff simply assigns as error the action of the trial court which granted Creighton a new trial. On cross-appeal Creighton contends the trial court erred in not sustaining its motions for a directed verdict or for a judgment notwithstanding the verdict because (1) the evidence established as a matter of law that the plaintiff's action was barred by the Nebraska Recreation Liability Act, Neb. Rev. Stat. §§ 37-1001 et seq. (Reissue 1988); (2) the evidence conclusively established that Cassio was guilty of contributory negligence more than

slight sufficient to bar recovery; and (3) the evidence established as a matter of law that Cassio was guilty of assumption of the risk.

Cassio, plaintiff's decedent, was a 31-year-old bachelor who had been in the U.S. Air Force for the past 10 years. His mother lives in New Jersey, and Cassio would visit home as his duties would permit, would call or write home usually once a month, and would send his mother $100 every month. Considering the mother's life expectancy of 15.04 years, and calculated at a 6-percent interest rate, this monthly payment would have a present worth of $11,673.59. In addition, Cassio's hospital bill amounted to $1,217.14, and the funeral bill was $2,927.

On May 14, 1984, Cassio went swimming in Creighton's pool located in the Kiewit Center. He put on scuba gear which consisted of a compressed air tank, a mask, a mouthpiece and regulator, a buoyancy compensator, a weight belt, and fins. He swam laps with his scuba gear on for 30 to 45 minutes. After that, he moved to the deep end of the pool and began doing breathing exercises, repeatedly submerging and coming up again.

Only one lifeguard, Catherine Dalipe, was on duty while Cassio was in the pool. Apparently, she had taken and passed a course at Creighton in advanced lifesaving. She had been sitting on the elevated guard stand when Cassio first came into the pool, but later moved down to a deck chair beside the pool.

At about 4:45 p.m. Dalipe's supervisor, Mike Hardigan, came in, and they talked for about 10 minutes. While they were talking, their attention was directed to the deep end of the pool by Kevin Croft, who had been working out with weights in the vicinity of the pool. He had seen a girl, whose identity is unknown, walk past the deep end of the pool, look down, and then step back and stick her hand to her mouth. She walked over to Dalipe and Hardigan, and they got up and started running. At that time, Croft jumped over the fence between the pool and the weight lifting area. When Croft got to the pool, Dalipe was diving in. According to Croft, Cassio was lying on his back on the bottom of the pool with his tank and weight belt off his body, but his buoyancy compensator was still strapped on. Dalipe tried to lift Cassio off the bottom, but could not

because he was too heavy. She came back up and said she was hurt. Dalipe testified that Cassio was still wearing his scuba gear. Croft then dove in and brought Cassio up and got him out of the pool with Hardigan's assistance. Croft noticed a pink champagne-like froth coming out of Cassio's mouth, and Cassio's face was cyanotic. CPR was attempted, paramedics arrived, and Cassio was taken to the hospital, where he was pronounced dead.

Plaintiff's petition alleged several acts of negligence on the part of Creighton University relating to the operation of its pool. Creighton in turn answered by alleging that the action was barred by the Nebraska Recreation Liability Act and that Cassio was guilty of contributory negligence and assumption of risk in diving without a partner. At the close of plaintiff's case, leave was granted plaintiff to strike the specific acts of negligence originally alleged and to simply state that Creighton was negligent in "failing to properly life guard its swimming pool while Michael Cassio was in this pool on 5/14/84."

At trial the plaintiff offered in evidence Omaha ordinances which stated that two lifeguards were required to be present at pools the size of Creighton's and which also required a pool of Creighton's classification to be under the immediate supervision of a certified operator. Evidence was also introduced indicating Creighton's violation of the ordinances by having only one lifeguard on duty and no certified operator. Creighton specifically stated that it had no objection to the reception into evidence of those ordinances and regulations.

Following the verdict in favor of the plaintiff, Creighton filed a motion for judgment notwithstanding the verdict or alternatively for a new trial. In its motion for a new trial Creighton contended, among other things, that the trial court erred in admitting evidence of violation of the ordinances because violation of the ordinances had not been specifically pleaded; in allowing a lay witness with no medical training to give his opinion, over objection, as to the cause of death; and in refusing to submit as part of the jury instruction on present cash value the present worth table and examples contained in NJI 4.13, although specifically requested to do so by Creighton.

Subsequent to Creighton's motion for judgment notwithstanding the verdict or for a new trial, plaintiff moved, pursuant to Neb. Rev. Stat. § 25-852 (Reissue 1985), to amend the petition to conform to the evidence.

The trial court sustained Creighton's motion for a new trial, finding that "the pleading of a city ordinance under the law of the State of Nebraska is essential to an allegation of negligence premised on a breach of that ordinance." The trial court further found:

> Plaintiff's Motion for Leave to Amend its Petition to allege specifically the city ordinance involved, and to conform the allegations of the Petition to the evidence adduced will not correct the original error of the Court in permitting evidence of such violation of said ordinance to be received; and that therefore, said Motion should be denied.

## ADMISSIBILITY OF THE ORDINANCES

We consider first Creighton's complaint regarding the admissibility of the Omaha city ordinances. That may be disposed of quickly by simply referring to the record and the fact that the ordinances were received without objection by Creighton. It cannot now complain of the admission of evidence to which no objection was made. See *Griffith v. Griffith*, 230 Neb. 314, 431 N.W.2d 609 (1988).

Second, evidence of an ordinance and its violation, although not pled, is admissible, if properly offered, under a general averment of negligence when it is relevant to a material issue in the case. See, *Owen, Administrator v. Moore*, 166 Neb. 226, 88 N.W.2d 759 (1958); *Carter v. Zdan*, 151 Neb. 185, 36 N.W.2d 781 (1949); *Omaha Street R. Co. v. Larson*, 70 Neb. 591, 97 N.W. 824 (1903). We see no reason why that rule should not apply in this case.

The plaintiff's allegations in the first instance, as well as the amended allegation that Creighton was negligent in failing to properly lifeguard its swimming pool, were broad enough and general enough that an ordinance establishing the required number of lifeguards is relevant to prove the alleged negligence in failing to properly lifeguard the pool.

## THE RECREATION LIABILITY ACT

The issue as to the Nebraska Recreation Liability Act refers to §§ 37-1001 et seq. The purpose of the Nebraska Recreation Liability Act is "to encourage owners of land to make available to the public land and water areas for recreational purposes by limiting their liability toward persons entering thereon . . . ." § 37-1001. Accordingly, "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes." § 37-1002.

Under the act,

> an owner of land who either directly or indirectly invites or permits without charge any person to use such property for recreational purposes does not thereby (1) extend any assurance that the premises are safe for any purpose, (2) confer upon such persons the legal status of an invitee or licensee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by an act or omission of such persons.

§ 37-1003. However, an owner is still liable "(1) for willful or malicious failure to guard or warn against a dangerous condition, use, structure, or activity, or (2) for injury suffered in any case where the owner of land charges the person or persons who enter or go on the land." § 37-1005. Therefore, the owner of a recreational facility is not liable for ordinary negligence unless a fee was charged for the right to enter the facility. In this instance, there was evidence which would support an inference that Cassio had paid a fee for his admission to the pool.

However, we further examine the applicability of the act to this case. Under the act, "land" includes "roads, water, water courses, private ways and buildings, structures, and machinery or equipment thereon when attached to the realty." § 37-1008(1). "Recreational purposes" includes, but is not limited to "[h]unting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water-skiing, winter sports, and visiting, viewing, or enjoying historical, archaeological, scenic, or scientific sites, or otherwise using

land for purposes of the user." § 37-1008(3).

Disregarding the issue as to whether Cassio paid an admission fee for use of the pool, it must first be determined whether the Recreation Liability Act applies to indoor swimming pools as being included within the definition for lands for recreational purposes. Since this is a question of law, this court has an obligation to reach an independent conclusion. *Fisbeck v. Scherbarth, Inc.*, 229 Neb. 453, 428 N.W.2d 141 (1988).

The Supreme Court of Pennsylvania, in *Rivera v. Philadelphia Theological Seminary*, 510 Pa. 1, 507 A.2d 1 (1986), held that the owner of an indoor swimming pool is not immune under Pennsylvania's Recreation Use Act.

The court explained:

> We turn first to the Seminary's contention that its liability for young Rivera's death is precluded under the provisions of the Recreation Use Act. Specifically, the Seminary would have us construe the Act to immunize any owner of a swimming pool from liability so long as no admission fee is charged for its use. Both public policy and the legislative history of the Recreation Use Act show that it was not intended to, and should not, apply to immunize the Seminary from liability for negligence in the maintenance of its indoor swimming pool. The policy implications of such a result are so far-reaching and out of harmony, generally, with the modern trend in tort law that we cannot ascribe an intent to immunize owners of indoor pools from tort liability for foreseeable harm without a stronger indication of such intent than we can discern in this statute.
>
> The stated purpose of the Recreation Use Act is "to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." 68 P.S. § 477-1. An owner of recreational land, as defined in the statute, "owes no duty of care to keep the premises safe for entry or use by others for recreational purposes." 68 P.S. § 477-3. An owner who "directly or indirectly invites or permits without charge

any person to use such property for recreational purposes" does not incur liability for injury to such persons, 68 P.S. § 477-4, except "[f]or wilful or malicious failure to guard or warn against a dangerous condition, use, structure or activity." 68 P.S. § 477-6.

"Recreational purpose," under the Act, "includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, water sports and viewing or enjoying historical, archaeological, scenic, or scientific sites." 68 P.S. § 477-2.

. . . .

The Recreation Use Act is therefore designed to encourage the opening up of large, private land holdings for outdoor recreational use by the general public by limiting the liability of the landowner. Considering that purpose, we believe the Legislature intended to limit the meaning of the words "buildings, structures and machinery or equipment when attached to the realty" in Section 2 of the Act, 68 P.S. § 477-2, to ancillary structures attached to open space lands made available for recreation and not to enclosed recreational facilities in urban regions. Grammatically, this construction is indicated by the dual presence of the conjunctive "and" in the list, both before "buildings" as well as after "structures." The position of the limiting clause "when attached to the realty" at the end of the sentence is another such indication. All of these factors make it appropriate to treat the list beginning with the word "buildings" as a restrictive modifer [sic] of "land, roads, water, watercourses." *Id.*

The intention of the Legislature to limit the applicability of the Recreation Use Act to outdoor recreation on largely unimproved land is evident not only from the Act's stated purpose but also from the nature of the activities it listed as recreational purposes within the meaning of the statute. Specifically, with the exception of "swimming," which may be either an indoor or outdoor sport, the recreational activities enumerated in the statute

are all pursued outdoors.

. . . .

Consequently, neither the language nor the purposes of the Recreation Use Act require a construction which applies its immunity to the Seminary's indoor pool. Instead, they induce us not to so construe it. Accordingly, we hold that the Seminary is not immune from tort liability under the provisions of Pennsylvania's Recreation Use Act.

507 A.2d at 6-9. The court noted in a footnote that "[t]he need to limit owner liability derives from the impracticability of keeping large tracts of largely undeveloped land safe for public use. The same need does not arise in the case of indoor recreational facilities which, in contrast, are relatively easy to supervise and monitor for safety hazards." 507 A.2d at 8 n.17.

In *Gibson v. Keith*, 492 A.2d 241 (Del. 1985), the court limited application of Delaware's recreational use immunity statute "to the recreational use of essentially undeveloped land and water areas (primarily rural or semi-rural land, water or marsh)" and found the statute "not applicable to urban or residential areas improved with swimming pools, tennis courts and the like." *Id*. at 244.

The appellant in *Erickson. v. Century Management Company*, 154 Ga. App. 508, 268 S.E.2d 779 (1980), sued to recover for personal injuries she sustained while swimming in a pool on the premises of a motel owned and operated by the appellees. The appellant, not a customer of the motel, was attending a party given by the management in celebration of the Fourth of July. The public was invited but no admission was charged.

The trial court awarded summary judgment to the appellees on the basis of Georgia's recreational use statutes. The appellant contended on appeal that the statutory immunity does not apply to the operation of a swimming pool owned by a private business. In reversing the trial court, the appellate court said:

The stated purpose of the Act is "to encourage owners of land to make land and water areas available to the public for recreational purposes . . ." Code Ann.

§ 105-403. We do not believe that the term "land and water areas" can reasonably be construed to encompass a swimming pool. Instead, the term clearly has reference to larger bodies of water, i.e., lakes and seashores. The appellees base their contention that the Act specifically applies to this case on the fact that swimming is one of the recreational purposes listed in Code Ann. § 105-404(c), which provides that the term "recreational purpose" "includes, but is not limited to hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites." However, we view this language as a further indication that the Act was intended to apply only to relatively large tracts of land and water, since only two or three of these activities could conceivably be done in any other setting.

154 Ga. App. at 508-09, 268 S.E.2d at 780.

The court in *Keelen v. State, Dept. of Culture, Recreation*, 463 So. 2d 1287 (La. 1985), held that Louisiana's recreational liability statutes did not immunize the State from a wrongful death claim for the drowning of plaintiff's decedent in a swimming pool in a state park. The court stated:

[I]t is clear that a swimming pool is not the type of instrumentality commonly found in the true outdoors. Rather, swimming pools are most often found in residential backyards. We recognize that "swimming" is included in the list of recreational activities in La.R.S. 9:2795; however, the word should be construed by reference to the context in which it is found. . . . Such consideration leads to the conclusion that the legislature intended to grant immunity for injuries incurred while swimming in lakes, rivers, ponds or other similar bodies of water. Thus, an injury which occurs in a swimming pool is not subject to a defense of immunity under La.R.S. 9:2791 and 2795. It follows that the State cannot assert these statutes in order to avoid liability in the instant case.

463 So. 2d at 1290-91.

Some courts have gone so far as to hold that there is no

immunity under a recreational liability act for backyard swimming pools. See, *Glittenburg v Wilcenski*, 174 Mich. App. 321, 435 N.W.2d 480 (1989); *Loyer v. Buchholz*, 38 Ohio St. 3d 65, 526 N.E.2d 300 (1988); *Boileau v. De Cecco*, 125 N.J. Super. 263, 310 A.2d 497 (1973), *aff'd* 65 N.J. 234, 323 A.2d 449 (1974).

Although we previously have held that the provisions of the Nebraska Recreation Liability Act do apply to urban as well as to rural areas, *Gallagher v. Omaha Public Power Dist.*, 225 Neb. 354, 405 N.W.2d 571 (1987), there are no Nebraska cases in which the act is applied to indoor recreational activities or swimming pools. We therefore hold that the act does not apply to independent indoor recreational facilities, including indoor swimming pools. Therefore, the trial court did not err in failing to grant Creighton's motions for directed verdict or for judgment notwithstanding the verdict on the basis of the Nebraska Recreation Liability Act.

## CASSIO'S CONTRIBUTORY NEGLIGENCE

Creighton argues that it was entitled to a directed verdict or judgment notwithstanding the verdict because as a matter of law Cassio was contributorily negligent to a degree sufficient to bar plaintiff's recovery.

An actor is contributorily negligent if (1) he or she fails to protect himself or herself from injury; (2) his or her conduct concurs and cooperates with the defendant's actionable negligence; and (3) his or her conduct contributes to his or her injuries as a proximate cause. *Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 438 N.W.2d 485 (1989); *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987); *Garreans v. City of Omaha*, 216 Neb. 487, 345 N.W.2d 309 (1984).

However, in order to sustain a motion for a directed verdict or for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. In considering the evidence for the purpose of such a motion, the party against whom a motion is made is entitled to have every controverted fact resolved in his or her favor and

to have the benefit of every inference which can reasonably be drawn from the evidence; if there is any evidence in favor of the party against whom the motion is made, the case may not be decided as a matter of law. *Looney v. Pickering,* 232 Neb. 32, 439 N.W.2d 467 (1989). A jury verdict will not be disturbed unless it is clearly wrong. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

Creighton's scuba expert, Don Stanger, testified that a scuba diver should never dive alone; i.e., he should always have a diving buddy present with him when making dives. Stanger had become certified as a scuba diver in 1971 and became a scuba instructor in August of 1974. In between he had received ratings as an advanced diver, diver master, and assistant instructor, all requirements to become an instructor. However, the record does not disclose whether these certifications came from the Red Cross, the YMCA, or some other organization. At the present time Stanger owns and runs a scuba shop in Omaha.

On the other hand, plaintiff's scuba expert testified that when scuba diving alone in a swimming pool, the lifeguard becomes the buddy of the diver. Furthermore, according to the plaintiff's expert, the rule against diving alone applies primarily to open water, where the dangers to a diver are greater. Plaintiff's expert, Ralph Johnson, is an associate professor of health, physical education, and recreation; the director of aquatics, and a diving coach at Indiana University. Johnson has a bachelor of science in education with majors in social studies and health and physical education and has a master of science degree in education. He is currently completing his doctoral work, Ph.D., in sports administration. His duties as director of aquatics concern programming the swimming pool, which includes staffing it with lifeguards, providing inservice training, and scheduling the pool for university classes. He has taken many courses in aquatics, water safety, lifesaving, lifeguarding, scuba diving, small craft, use of canoes and sailboats, pool management, pool design, and pool operation. He was originally trained in scuba diving in 1955. In 1961 he achieved his instructor's certification through the national YMCA scuba program and has been serving in that capacity ever since, teaching on the university level and also to the public. He has

been certified by the Professional Association of Diving Instructors for a period of about 10 years. He is also certified as a scuba instructor by the YMCA of the U.S.A. He has just completed writing large sections of the YMCA Scuba Instructor's Leadership Manual, which is used for training YMCA scuba instructors.

Given the conflicting testimony of the scuba experts on the propriety of a scuba diver's diving alone, this court cannot conclude that as a matter of law Cassio was contributorily negligent. This was an issue for the jury to decide upon proper instructions, which it did. The trial court did not err in failing to grant Creighton's motion for a directed verdict or for judgment notwithstanding the verdict.

## ASSUMPTION OF THE RISK

Creighton also argues that as a matter of law Cassio had assumed the risk of diving alone, and therefore a verdict should have been directed in favor of Creighton on that basis.

The only evidence in the record remotely relating to this issue came from Creighton's witness Stanger. He testified as follows:

Q. In your opinion, sir, did Mr. Cassio then deviate from the standard of care in holding his breath when he arose?

A. I'd say so, yes.

Q. Now, there has been evidence here that Mr. Cassio was a scuba diver for approximately ten years. In your opinion, sir, would a scuba diver with ten years' experience know and appreciate the dangers of diving alone, and holding his breath?

A. Just from the length of time he has been diving, I'd say yes.

Language including "standard of care," "[i]n your opinion," and "would a scuba diver with ten years' experience know" is the language of negligence or of tort law.

Courts, including this one, have had difficulty dealing with the two concepts: negligence and assumption of risk. *Landrum v. Roddy*, 143 Neb. 934, 12 N.W.2d 82 (1943), contains a comprehensive explanation and comparison of the two doctrines. This court stated:

Is the defense of assumption of risk in negligence cases under the maxim *"volenti non fit injuria"* consistent with the defense of contributory negligence? A discussion of this distinction is found in 38 Am. Jur. 847, sec. 172: "The defense of assumption of risk is closely associated with the defense of contributory negligence. One who does not exercise ordinary care for his own safety is said, speaking broadly, to assume the risk, that is, take the chance, of being hurt. The defense of assumption of risk is not incompatible with contributory negligence; the two defenses may arise under the same state of facts. Some courts regard the defenses as interchangeable. However, there is a clear distinction between the defense of assumption of risk and the defense of contributory negligence, notwithstanding they may arise under the same set of facts and may sometimes overlap. There is a line of demarcation which, if carefully scrutinized and followed, will allow the court to differentiate between them. Assumption of risk rests in contract or in the principle expressed by the ancient maxim, *"volenti non fit injuria,"* whereas contributory negligence rests in tort. The former involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care, whereas the defense of contributory negligence implies the failure of the plaintiff to exercise due care. As stated in some decisions, assumption of risk is a mental state of willingness, whereas contributory negligence is a matter of conduct." A further discussion of this will be found in 45 C.J. 1043, sec. 600. As stated in *White v. McVicker, supra*: "While the doctrine of contributory negligence and assumption of risk may arise under the same set of facts and sometimes thus overlap each other, yet we have consistently distinguished them and held that they are distinct and separate and must not be confounded with each other." As stated in *Watterlund v. Billings, supra*: "There is a distinction between the doctrine of contributory negligence and the doctrine of assumed risk, since there may be the voluntary assumption of the risk of

a known danger such as will bar one from recovery for injury to person or property, even though in the exercise of due care." [Citations omitted.] Assumption of risk under the maxim *"volenti non fit injuria"* involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care, whereas, the defense of contributory negligence implies the failure of the plaintiff to exercise due care. It may be said that contributory negligence involves the notion of some fault or breach of duty on the part of the one charged therewith, or a failure to use such care for his safety as an ordinary prudent person would have used under the same or similar circumstances. On the other hand, under the assumption of risk, even though the risk be obvious, the person may be free from any suggestion of fault or negligence on his part. While under a certain set of facts the two may be difficult to distinguish and sometimes seem to overlap, yet when carefully considered they can be distinguished and are distinct and separate and not inconsistent.

*Landrum v. Roddy, supra* at 946-47, 12 N.W.2d at 89.

Creighton cites *Hollamon v. Eagle Raceway, Inc.*, 187 Neb. 221, 188 N.W.2d 710 (1971), in support of its contention that Cassio assumed the risk of drowning by diving alone. In *Hollamon*, this court reiterated that one who participates in the sport of stock car racing assumes the ordinary risks of that sport, including injury when a car goes out of control and enters the pit area. According to the court, "where one, knowing and comprehending the danger, voluntarily exposes himself to it, although not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom." *Id.* at 224, 188 N.W.2d at 711.

In *Hollamon*, the court said:

There is no factual dispute that plaintiff knew and appreciated the danger of being in the pit area. Plaintiff's car on previous occasions had generally been in this same area. He was aware that he was directly east of the opening off the first turn while in the pit area. Plaintiff conceded that there are some risks incident to racing, and estimated

that if he were to consider racing accidents over the whole racing season they would average one an evening. He stated that he would expect cars to go out of control on occasions, and had considered the possibility of an accident from a car coming into the pit area.

*Id.* at 225, 188 N.W.2d at 712.

There was no question in *Hollamon* that the plaintiff knew and appreciated the dangers. He said that he did. That is far removed from the evidence in this case. Here, one witness gives an opinion that from the length of time that Cassio had been diving, he, the witness, would say "yes," Cassio would know the risks of diving alone and holding his breath. This presents a fact question as to a finding of negligence, not assumption of risk. Perhaps testimony that Cassio was a certified diver, that to become certified he would have had to have taken a course in scuba diving, and that the standard instructional course would have required that he be taught the dangers of diving alone and holding his breath while ascending might permit a finding that he did in fact know the danger. However, absent such evidence in the record, there is a real question as to whether there was even a submissible issue as to his knowledge. Certainly the evidence was only sufficient to have permitted a jury to make a factual finding on that basis, which it did.

Creighton's assignment of error regarding the failure of the trial court to find that Cassio was contributorily negligent or assumed the risk as a matter of law is without merit.

## PRESENT WORTH INSTRUCTION

In its motion for a new trial, Creighton contended that the trial court erred in failing to include within its instruction to the jury the present worth tables found as part of NJI 4.13. The court's instruction on damages did require the jury to reduce any verdict to its present worth and included in that instruction the first two paragraphs of NJI 4.13. However, it did not include the examples of calculation or the present worth table itself.

Creighton cites us to rule (a), adopted by this court on November 20, 1968, of the Nebraska Jury Instructions, which states:

> Whenever Nebraska Jury Instructions (NJI) contains an instruction applicable in a Civil or Criminal Case, and the Court, giving due consideration to the facts and the prevailing law, determines that the jury should be instructed on the subject, the Nebraska Jury Instruction shall be used.

In *Jones v. Foutch*, 203 Neb. 246, 278 N.W.2d 572 (1979), this court reversed a judgment of the district court because the trial court gave its own instruction concerning gross negligence rather than the one contained in Nebraska Jury Instructions. In doing so, this court referred to rule (a) and added: "Whenever applicable and practicable, Nebraska Jury Instructions (NJI) are to be used when charging the jury . . . ." *Id.* at 261, 278 N.W.2d at 580.

In a later case, *Enyeart v. Swartz*, 218 Neb. 425, 355 N.W.2d 786 (1984), the district court was reversed and a new trial granted because the trial court did not follow the Nebraska Jury Instructions fully in giving its instructions, nor did it instruct on proximate cause. The court stated:

> Although neither party raised any objection at the time of the instruction conference and appellant does not assign it as one of his errors, an examination of the instructions tendered by the court to the jury discloses that the court did not provide the jury with an instruction on the definition of "proximate cause" as required by NJI 3.41. No such instruction was given even though this was a case in which the issue of the proximate cause of the accident was vigorously disputed. . . . While it may not be error, per se, to fail to give a definition of proximate cause as set out in NJI 3.41 if the matter is not an issue [citation omitted], the failure to give an instruction on the definition of proximate cause where, as here, it is one of the principal issues in the case must be considered by the court to be plain error, requiring reversal.

*Enyeart v. Swartz, supra* at 426-27, 355 N.W.2d at 788.

The trial court here gave as its reason for not including the present worth tables the following explanation:

> The court has given 4.13 in essence, but has not included examples of the table. It is my feeling that the inclusion of

those materials are [sic] confusing to a jury, and would not serve the ultimate purpose of this trial, which is to seek the truth, because I don't think confusion leads to truth. With that in mind, the Court overrules the objection to the instruction and declines to include the examples and/or the table in the instruction.

We examine the instruction given to determine whether it is a correct statement of the law. *Zeeb v. Delicious Foods*, 231 Neb. 358, 436 N.W.2d 190 (1989). It is not error to refuse to give a requested instruction if the substance of the request is in the instruction actually given. *Fisher Corp. v. Consolidated Freightways*, 230 Neb. 832, 434 N.W.2d 17 (1989); *Carnes v. Weesner*, 229 Neb. 641, 428 N.W.2d 493 (1988). In order to establish as error the trial court's refusal to give a tendered instruction, an appellant is under a threefold burden to show that he or she was prejudiced by the court's refusal, that the tendered instruction *is a correct statement of the law*, and that the instruction is applicable to the evidence in the case. *Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 438 N.W.2d 485 (1989); *Zeeb v. Delicious Foods, supra.*

The law as reflected by Nebraska's general rule is that an award for future damages must be reduced to its present worth. *Lake v. Southwick*, 188 Neb. 533, 198 N.W.2d 319 (1972); *Abbott v. Northwestern Bell Tel. Co.*, 197 Neb. 11, 246 N.W.2d 647 (1976).

The instruction given by the trial court was a correct statement of the law. The suggested examples and the present worth table found at NJI 4.13 of the 1969 edition of Nebraska Jury Instructions are not a statement of the law. The trial court did not err in refusing Creighton's request, and it should not have granted a new trial on that basis.

## OPINION TESTIMONY BY LAY WITNESSES

Finally, we deal with Creighton's complaint that Ralph Johnson was permitted to testify that the cause of Cassio's death was cerebral anoxia. Johnson was no more qualified to state an opinion in this regard than any other scuba diver who knows that death may occur from drowning after hyperventilation or from an air embolism following a too rapid

ascent to the surface of the water after having taken in quantities of compressed air. The opinion was not based on what the witness knew because of his experience and education, but on what he had been told. It was based primarily upon the autopsy report of Dr. Jerry Jones, who gave as his opinion that Cassio was hyperventilating and lost consciousness and thereby drowned. Johnson had no qualifications within the meaning of Neb. Rev. Stat. § 27-702 (Reissue 1985) to offer an opinion as to the cause of death. His testimony was pure speculation and should not have been received. *State v. Johnson*, 215 Neb. 391, 338 N.W.2d 769 (1983).

Dr. Claude Zanetti, who specialized in internal medicine and in the subspecialty of pulmonary diseases with specialized training in treating scuba diving accident victims, testified that the cause of death was an arterial gas embolism.

The cause of death in this instance was extremely important because it relates to proximate cause; i.e., if death was due to drowning, there was evidence from which a jury could find that properly trained lifeguards on duty could have saved Cassio's life. On the other hand, if death was due to an air or gas embolism, there was probably nothing Creighton could have done to have prevented the accident short of prohibiting Cassio from entering the pool.

Due to the importance of the cause of death, permitting an unqualified witness to express an opinion on that subject constituted prejudicial error.

Although we disagree as to the basis, we agree with the trial court that a new trial was required, and therefore the judgment of the district court is affirmed.

AFFIRMED.

BOSLAUGH, J., concurs in the result.